501-07/PJG/PLS
FREEHILL HOGAN & MAHAR, LLP
Attorneys for Plaintiff Gusto Shipping S.A.
80 Pine Street
New York, New York 10005
(212) 425-1900
Peter J. Gutowski (PG 2200)
Pamela L. Schultz (PS 8675)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------

GUSTO SHIPPING S.A.,                               07 CV 9889 (BSJ)
                              Plaintiff
                                                   **DECLARATION OF**
                                                   **RUSSELL ST. JOHN GARDNER**

        - against -

SITARA SHIPPING LIMITED,

                              Defendant
-----------------------------------------------------------------

        I, RUSSELL ST JOHN GARDNER, declare as follows:

        1.      I am a partner at the law firm of Hill Dickinson LLP located at Irongate House,
22-30 Duke's Place, London, United Kingdom. My practice primarily involves shipping, dispute
resolution, commodities and international trade. Within my shipping practice, I specialize in
charterparties, bills of lading, ship sale and purchase disputes, classification societies, and
international trade and commodity disputes.   I am also involved frequently in arbitration
proceedings.

        2.      We are the solicitors who represented Gusto Shipping SA of Panama (the
Plaintiff/Owners) in the disputes between it and Charterers Sitara Shipping Limited of Mumbai,
India (the Defendant/Charterers) arising out of and relating to two charter parties dated 16th
August 2005 and 26th September 2005 for the M/V GUSTO. The disputes were subject to and
proceeded to London arbitration.   It is also relevant to note that Sitara Shipping Limited
instructed lawyers to represent them in these proceedings – Mr Manoj Khatri of Prashant S.

NYDOCS1/306802.1

Pratap Law Office, Mumbai, India -- and that they participated fully in the proceedings, serving defences and counterclaims etc.

3.     I certify that Exhibit A hereto is a true and accurate copy of the charterparty and arbitration agreement between Gusto Shipping SA and Sitara Shipping Limited dated 16th August 2005. The arbitration agreement is contained at clauses 17 and 112 of the charterparty.

4.     The London Tribunal (Mr William Robertson as sole arbitrator) issued and published its award on 12th April 2007 in favour of Owners and against Charterers. I certify that Exhibit B hereto is a true and accurate copy of the original Award issued and published by the London Tribunal in favour of Gusto Shipping SA and against Sitara Shipping Limited.

5.     I also certify that Exhibit C hereto is a true and accurate copy of the charterparty and arbitration agreement between Gusto Shipping SA and Sitara Shipping Limited dated September 26th 2005. No formal charterparty was ever drawn up but the charterparty is evidenced by the recap of clean fixture which was based on a previous charterparty between the same parties (*"OWISE AS PER MV ST.CRISPIAN/SITARA C/P DATED 23RD JUNE 2005"*), a copy of which was attached to the fixture. The arbitration agreement is contained at additional clause 40 of the (St Crispian) charterparty.

6.     The London Tribunal (Mr William Robertson as sole arbitrator) issued and published its award on 12th April 2007 in favour of Owners and against Charterers. I certify that Exhibit D hereto is a true and accurate copy of the original Award issued and published by the London Tribunal in favour of Gusto Shipping SA and against Sitara Shipping Limited.

7.     Following publication of the two awards, I sent these to Mr Khatri with a demand for payment in the usual way (albeit that they were also sent by the Tribunal) but no response was received. I certify that Exhibit E is a true and accurate copy of the relevant correspondence with Mr Khatri. Following the two messages in June 2007 and after receiving no positive response to telephone calls made to Mr Khatri, I was informed by my clients on 13th July 2007 that they had

spoken direct to the person in charge at Sitara Shipping Limited (Captain Sahi) and were told that Sitara would be contesting the awards. No such challenge was ever made however and any appeal would have been time barred in any event: any appeal must be brought within 28 days of the date of an award pursuant to section 70 (3) of the Arbitration Act 1996 which governed these proceedings.

I declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct to the best of my information and belief.

Dated: 19th June 2008

At:  Irongate House
     22-30 Duke's Place
     London EC3A 7HX

**RUSSELL ST JOHN GARDNER**



# ORIGINAL

## Time Charter

GOVERNMENT FORM

*Approved by the New York Produce Exchange*

November 6th, 1913-Amended October 20th, 1921; August 6th, 1931; October 3rd,1946

1 **This Charter Party** made and concluded in............*Karachi*.......*16th*..........day of .................*August*....*19...2005*.......................

2 Between.................*Gusto Shipping S.A. of Panama*...................................................................................

3 Owners of the good.................................................{Steamship (Motorship)}...."*GUSTO*"...........of......*(See Clause 31)*.....................

4 of...........................tons gross register, and...............................tons net register, having engines of...............................................indicated horse power

5 and with hull, machinery and equipment in a thoroughly efficient state, and classed......... ......................................................................

6 .........................of about.........................................cubic feet bale capacity, and about...........................................tons of 2240 lbs.

7 deadweight capacity (cargo and bunkers, including fresh water and stores not exceeding one and one-half percent of ship's deadweight capacity,

8 allowing a minimum of fifty tons) on a draft of.... .............feet.............inches on..............Summer free board, inclusive of permanent bunkers

9 which are of the capacity of about..................................................tons of fuel, and capable of steaming, fully laden, under good weather

10 conditions about...........knots on a consumption of about.... .........................tons of best Welsh coal best grade fuel oil best grade Diesel oil,

11 now.....trading..................................................................................................................................................

12 .....................and..................*Sitara Shipping Ltd*..........................Charterers of the City of....................*Mumbai, India*.................................

13        Witnesseth, That the said Owners agree to let, and the said Charterers agree to hire the said vessel, from the time of delivery, for

14 about.......*one time charter trip, always afloat always accessible always within I.W.L. via safe port(s) safe berth(s) safe anchorage(s) via ISBA Mumbai to ISBA Elmaan with a cargo of lawful/harmless/non-dangerous generals including steel/steel products all cargoes to be loaded/stowed/trimmed/carried/discharged at Charterers time/risk/expense in conformity with IMO/local/national/international rules/regulations and in accordance with vessel's class certificate and always to Master's*

15 *satisfaction, duration about 25-35 days without guarantee*.................within below mentioned trading limits.

16 Charterers to have liberty to sublet the vessel for all or any part of the time covered by this Charter, but Charterers remaining responsible for

17 fulfillment of this Charter Party. *Acceptance of delivery of the vessel shall not constitute any waiver of Owners' obligation.*

18 vessel to be placed at the disposal of the Charterers, at..............*on dropping last outward sea pilot Mumbai, any time day or night,* 19 *Sundays and Holidays included*.......................................................................................................................

20 in such dock or at such wharf or place (where she may safely lie, always afloat, at all times of tide, except as otherwise provided in clause 6.) as

21 the Charterers may direct. If such dock, wharf or place be not available time to count as provided for in clause No 5 Vessel on *arrival loading port* her delivery to be

22 ready to receive *any permissible* cargo with clean-swept holds and *throughout the period of this charter unless caused by Charterers or their agents fault* tight, staunch, strong and in every way fitted for the service, having water ballast, *vessel's cargo gear winches and*

23 donkey boiler with sufficient steam power, or if not equipped with donkey boiler, then other power sufficient to run all the *vessel's cargo gear* winches at one and the same

24 time (and with full complement of officers, seamen, engineers and firemen for a vessel of her tonnage), to be employed, in carrying lawful , merch-

25 andise including petroleum or its products, in proper containers, excluding......*See Clause 41*.............................................................

26 (vessel is not to be employed in the carriage of Live Stock, but Charterers are to have the privilege of shipping a small number on deck at their risk

27 all necessary fittings and other requirements to be for account of Charterers), in such lawful trades, between safe port and/or ports in British North

28 America, and/or United States of America, and/or West Indies, and/or Central America, and/or Caribbean Sea, and/or Gulf of   Mexico, and/or

1

EXHIBIT

A

# ORIGINAL



29  ~~Mexico, and/or South America~~..................................................................................................................~~and/or Europe~~

30  ~~and/or Africa, and/or Asia, and/or Australia, and/or Tasmania, and/or New Zealand, but excluding Magdalena River, River St. Lawrence between~~

31  ~~October 31st and May 15th, Hudson Bay and all unsafe ports; also excluding, when out of season, White Sea, Black Sea and the Baltic,~~

32  *in trading area allowed (See Clause 79)*.................................................................................................................................................

33  ............................................................................................................................................................................................................

34  ............................................................................................................................................................................................................

35  as the Charterers or their Agents shall direct, on the following conditions :

36      1. That *whilst on hire* the Owners shall provide and pay for all provisions, *fresh water* wages *including all Officer's/crew's overtime* and consular shipping and discharging fees of the Crew shall pay for the

37  insurance of the vessel, also for all the cabin, deck, engine-room and other necessary stores, including boiler water and maintain her class and keep

38  the vessel in a thoroughly efficient state in hull, machinery and equipment *with inspection certificates necessary to comply with all current requirement at all ports of call and canal* for and during the service.

39      2.That the Charterers shall provide and pay for all the fuel except *lubricating oil* as otherwise agreed, Port Charges, Pilotages, Agencies, Commissions,

40  Consular Charges (except those pertaining to the Crew), and all other usual expenses except those before stated,   but when the vessel puts into

41  a port for causes for which ~~vessel is~~ *Owners are* responsible,   then all such charges incurred shall be paid by the Owners.   Fumigations ordered because of

42  illness of the crew to be for Owners account.   Fumigations ordered because of cargoes carried or ports visited while vessel is employed under this

43  charter to be for Charterers account. All other fumigations to be for Charterers account after vessel has been on charter for a continuous period

44  of six months or more.

45      Charterers ~~are~~   to provide necessary dunnage and shifting boards, also any extra fittings   requisite for a special trade or unusual cargo,   but

46  Owners to allow them the use of any dunnage and shifting boards already aboard vessel *subject to Master's approval.* Charterers to have the privilege of using shifting boards

47  for dunnage, they making good any damage thereto.

48      3. ~~That the Charterers, at the port of delivery,   and the Owners, at the port of re-delivery,   shall take over and pay for all fuel remaining on~~

49  ~~board the vessel at the current prices in the respective ports, the vessel to be delivered with not less than~~..............................~~tons and not more than~~

50  ...............~~tons and to be re-delivered with not less than~~.............~~tons and not more than~~.............~~tons.~~- *See Clause 30*

51      4. That the Charterers shall pay for the use and hire of the said Vessel at the rate of ...............*USD4,750 daily including overtime payable*

52  *every 15 days in advance to Owners nominated bank*..........................~~United States Currency per ton on vessel's total deadweight carrying~~-

53  ~~stores, on~~........................~~summer freeboard, per Calendar Month~~, commencing on and from the day/*time* of her delivery, as aforesaid, and at

54  and after the same rate for any part of a *day* ~~month~~; hire to continue until the hour of the day of her re-delivery in like good order and condition, ordinary

55  wear and tear excepted, to the Owners (unless lost) ~~at~~............*on dropping last outward sea pilot one safe port East Africa or Red Sea in Charterers' option, any time day or night,*

56  *Sundays and Holiday included*...........unless otherwise mutually agreed. Charterers ~~are~~ to give Owners not less than............ *7/5* ..................days *approximate redelivery*

57  notice of vessels expected date of redelivery, and probable port *and 3/2/1 day(s) definite notice. Charterers to keep Owners advised of vessel's movements and notify Owners immediately for unforeseen delay.*

58      5.  Payment of said hire to be made ~~in New York~~ in cash in United States Currency, ~~semi-monthly~~ in advance, *to Owner's bank account as per Clause 29* and for the last ~~half month~~ or

# ORIGINAL



59  part of same the approximate amount of hire, and should same not cover the actual time, hire is to be paid *but always subject to the wording of*

*Clause 29* for the balance day-by-day, as it becomes

60  due, if so required by Owners, unless bank guarantee or deposit in made by the Charterers, otherwise failing the punctual and regular payment of the

61  hire, or bank guarantee, or on any breach of this Charter Party,  the Owners shall be at liberty   to withdraw the vessel from the service of the

62  Charterers, without prejudice to any claim they (the Owners) may otherwise have on the Charterers. Time to count from 7 a.m. on the working day

63  following that on which written notice of readiness has been given to Charterers or their Agents before 4 p.m., but if required by Charterers, they

64  to have the privilege of using vessel at once, such time used to count as hire.

65      Cash for vessel's ordinary disbursements at any port may be advanced as required by the Captain, by the Charterers or their Agents, subject

66  to 2 1/2% commission and such advances shall be deducted from the hire. The Charterers, however, shall in no way be responsible for the application

67  of such advances.

68      6.  That the cargo or cargoes be laden and/or discharged in any *safe* dock or at any *safe* wharf or *safe* place that Charterers or their Agents may

69  direct, provided the vessel can safely lie always afloat at any time of tide, except at such places where   it is customary for similar size vessels to safely

70  lie aground.

71  ·    7.  That the whole reach of the Vessel's Hold, Decks, and usual places of loading (not more than   she can reasonably stow and carry ), also

72  accommodations for Supercargo, if carried, shall be at the Charterers' disposal, reserving only proper end   sufficient space for Ship's officers, crew,

73  tackle, apparel, furniture, provisions, stores and fuel .Charterers have the privilege of passengers as for as accommodations allow, Charterers

74  paying Owners............per day per passenger for accommodations and meals. However, it is agreed that in case any fines or extra expenses are

75  incurred in the consequence of the carriage of passengers, Charterers are to bear such risk and expense. *No passengers are allowed*

76      8.  That the Captain shall prosecute his voyages with the utmost despatch, and shall render all customary assistance with ship's crew and

77  boats. The Captain (although appointed by the Owners), shall be under the orders and directions of the Charterers as regards *vessel's* employment

78  and agency; and Charterers are to load, stow, *tally, dunnage, lash, secure, unlash, undunnage, unsecure, discharge* and trim the cargo at their

expense under the supervision of the Captain, who is to sign Bills of Lading for

79  ,argo as presented, in conformity with Mate's or Tally Clerk's receipts *unless Charterers are making use of their authority to sign as per Clause 49.*

80      9.  That if the Charterers shall have reason to be dissatisfied with the conduct of the Captain, Officers, or Engineers, the Owners shall on

81  receiving particulars of the complaint, investigate the same, and, if necessary, make a change in the   appointments.

82      10. That the Charterers shall have permission to appoint a Supercargo, who shall accompany the vessel *under his own risk and provided that*

*prior to his boarding he has signed and delivered to vessel's Master/Owners relevant Letter of Indemnity* and see that voyages are prosecuted

83  with the utmost despatch. He is to be furnished with free accommodation, and same fare as provided for Captain's table, Charterers paying at the

84  rate of $1.00 *USD10.00* per day.   Owners to victual Pilots and Customs Officers, and also, when authorized by Charterers or their Agents, to victual Tally

85  Clerks, Stevedore's Foreman, etc., Charterers paying at the current rate per meal, for all such victualling. *See Clause 45*

86      11. That the Charterers shall furnish the Captain from time to time with all requisite instructions and sailing directions, in writing, *in English* and the

87  Captain shall keep a full and correct Log of the voyage or voyages, which are to be patent to the Charterers or their Agents, and furnish the Char- 88

tearers, their Agents or Supercargo, when required, with at true copy of daily *deck and engine* Logs, *in English* showing the course of the vessel

and distance run and the

# ORIGINAL



89  consumption of fuel.

90      12. That the Captain shall use diligence in caring for the ventilation of the cargo. *Vessel has natural ventilation.*

91      13. ~~That the Charterers shall have the option of continuing~~ this charter for a further period of.............................................................

92  .............................................................................................................................................

93  ~~on giving written notice thereof to the Owners or their Agents~~........days previous to the expiration ~~of the first-named term, or any declared option.~~

94      14. That if required by Charterers, time not to commence before.................*0001 hours 19th August 2005*.............................and should vessel

95  not have *been delivered* ~~given written notice of readiness~~ on or before.....*2400 hours 26th August 2005*.........~~but not later than 4 p.m.~~ Charterers or

96  their Agents to have the option of cancelling this Charter at any time not later than the day of vessel's readiness.

97      15. That in the event of the loss of time from deficiency *and/or default* of men or *deficiency of stores,* fire, breakdown or damages to hull, machinery or equipment,

98  grounding, detention by average accidents to ship or cargo, drydocking for the purpose of examination or painting bottom, or by any other cause

99  preventing the full working of the vessel, the payment of hire shall cease for the time thereby lost ; and if upon the voyage the speed be reduced by

100  ct in or breakdown of any part of her hull, machinery or equipment,   the time so lost,   and the cost of any extra fuel consumed in consequence

101  thereof, and all *proven and directly related* extra expenses shall be deducted from the hire.

102      16. That should the vessel be lost, money paid in advance and not earned ( reckoning from the date of loss or   being last heard of )   shall be

103  returned to the Charterers at once. The act of God, enemies, fire, restraint of Princes, Rulers and People,   and all dangers and accidents of the Seas,

104  Rivers, Machinery, Boilers and Steam Navigation, and errors of Navigation throughout this Charter Party, always mutually excepted.

105      The vessel shall have the liberty to sail with or without pilots, to tow and to be towed, to assist vessels in distress, and to deviate for the

106  purpose of saving life and property.

107      17. ~~That should any dispute arise between Owners and the Charterers,   the matter in dispute shall be referred to three persons at New York,~~

108  ~~one to be appointed by each of the parties hereto, and the third by the two so chosen; their decision or that of any two of them, shall be final, and for~~

109  ~~the purpose of enforcing any award, this agreement may be made a rule off the Court.   The Arbitrators shall be commercial men.~~

    *This Charter Party shall be governed by and construed in accordance with English law and any dispute arising out of this Charter Party shall be referred to arbitration in London accordance with the arbitration act 1996 or any statutory modification or re-enactment thereof for the time being in force. Unless the parties agree upon a sole arbitrator, one arbitrator shall be appointed by each party and the arbitrators so appointed shall appoint a third arbitrator, the decision of the three-man tribunal thus constituted or any two or them, shall be final. On the receipt by one rty of the nomination in writing of the other party's arbitrator, that party shall appoint their arbitrator within fourteen days, failing which the decision of the single arbitrator appointed shall be final. The arbitrators shall be members of the London Maritime Arbitrators Association. For disputes where the total amount in dispute does not exceed the amount of USD50,000 the arbitration shall be conducted in accordance with the small claims procedure of the London Maritime Arbitrators Association.*

110      18. That the Owners shall have a lien upon all cargoes, and all sub-freights/*sub-hires* for any amounts due under this Charter, including General Average

111  age contributions, and the Charterers to have a lien on the Ship for all monies paid in advance and not earned, and any overpaid hire or excess

112  deposit to be returned at once.   Charterers will not suffer,   nor permit to be continued, any lien or encumbrance incurred by them or their agents, which

113  might have priority over the title and interest of the owners in the vessel.

114      19.  That all derelicts and salvage shall be for Owners' and Charterers' equal benefit after   deducting Owners' and Charterers'   expenses and

115  Crew's proportion. General Average shall be adjusted, stated and settled, according to Rules 1 to 15,   inclusive,  17 to 22, inclusive, and Rule F of

116  York-Antwerp Rules *1974, or any amendment, in London* ~~1924, at such port or place in the United States as may be selected by the carrier, and as to matters not provided for by these~~

117  ~~Rules, according to the laws and usages at the port of New York. In such adjustment disbursements in foreign currencies shall be exchanged into~~

# ORIGINAL



118 ~~United States money at the rate prevailing on the dates made and allowances for damage to cargo claimed in foreign currency shall be converted at~~

119 ~~the rate prevailing on the last day of discharge at the port or place of final discharge of such damaged cargo from the ship. Average agreement or~~

120 ~~bond and such additional security, as may be required by the carrier, must be furnished before delivery of the goods. Such cash deposit as the carrier~~

121 ~~or his agents may deem sufficient as additional security for the contribution of the goods and for any salvage and special charges thereon, shall, if~~

122 ~~required, be made by the goods, shippers, consignees or owners of the goods to the carrier before delivery. Such deposit shall, at the option of the~~

123 ~~carrier, be payable in United States money and be remitted to the adjuster. When so remitted the deposit shall be held in a special account at the~~

124 ~~place of adjustment in the name of the adjuster pending settlement of the General Average and refunds or credit balances, if any, shall be paid in~~

125 ~~United States money.~~

126 ~~In the event of accident, danger, damage, or disaster, before or after commencement of the voyage resulting from any cause whatsoever,~~

127 ~~whether due to negligence or not, for which, or for the consequence of which, the carrier is not responsible, by statute, contract, or otherwise, the~~

128 ~~goods, the shipper and the consignee, jointly and severally, shall contribute with the carrier in general average to the payment of any sacrifices,~~

129 ~~losses, or expenses of a general average nature that may be made or incurred, and shall pay salvage and special charges incurred in respect of the~~

13? ~~ods, If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully and in the same manner as if such salving ship or~~

131 ~~ships belonged to strangers.~~

132    Provisions as to General Average in accordance with the above *and the New Jason Clause* are to be included in all bills of lading issued hereunder. . *It is understood that the charter hire not to contribute to General Average.*

133    20. Fuel used by the vessel while off hire, ~~also for cooking, condensing water, or for grates and stoves~~ to be agreed to as to quantity,   and the

134 cost of replacing same, to be allowed by Owners.

135    21. ~~That as the vessel may be from time to time employed in tropical waters during the term of this Charter, Vessel is to be docked at a~~

136 ~~convenient place, bottom cleaned and painted whenever Charterers and Captain think necessary, at least once in every six months, reckoning from~~

137 ~~time of last painting, and payment of the hire to be suspended until she is again in proper state for the service.~~

138 ................................................................................................................................................................................

139 ................................................................................................................................................................................

140    22. Owners shall maintain the gear of the ship as fitted, providing gear (for all *vessel's cargo gears* ~~derricks~~ ) capable of handling lifts up to *as specified in Clause 31 and Owners to provide on the vessel light clusters as on board for night work at all hatches simultaneously free of charge to Charterers and are to maintain same in efficient condition throughout this charter.* ~~three tons, also~~

14(  ~~viding ropes, falls, slings and blocks. If vessel is fitted with derricks capable of handling heavier lifts, Owners are to provide necessary gear for~~

142 ~~same, otherwise equipment and gear for heavier lifts shall be for Charterers' account. Owners also to provide on the vessel lanterns and oil for~~

143 ~~night work, and vessel to give use of electric light when so fitted, but any additional lights over those on board to be at Charterers' expense. The~~

144 ~~Charterers to have the use of any gear on board the vessel.~~

145    23. Vessel to work night and day, *Sundays and holidays included,* if required by Charterers, and all winches to be at Charterers' disposal during loading and discharging;

146 ~~steamer to provide one winchman per hatch to work winches day and night, as required, Charterers agreeing to pay officers, engineers, winchmen,~~

147 ~~deck hands and donkeymen for overtime work done in accordance with the working hours and rates stated in the ship's articles. If the rules of the~~

148 ~~port, or labor unions, prevent crew from driving winches,~~ *qualified* shore Winchmen to be *employed and* paid by Charterers In the event of a disabled winch or winches, or

149 insufficient power to operate winches, Owners to pay for shore engine, or engines, in lieu thereof, if required, and pay any loss of time occasioned

150 thereby. *In which case vessel to remain on-hire.*

151    24. It is also mutually agreed that this Charter is subject   to all the terms and provisions of and all the exemptions   from liability   contained

152 in the Act of Congress of the United States approved on the 13th day of February, 1893, and entitled   " An Act relating to Navigation of Vessels',

153 etc., " in respect of all cargo shipped under this charter to or from the United States of America. It is further subject to the following clauses both

# ORIGINAL



154 of which are to be included in all bills of lading issued hereunder:

155 ~~U.S.A. Clause Paramount~~

156 ~~This bill of lading shall have effect subject to the provisons of the Carriage of Goods by Sea Act of the United States, approved April~~

157 ~~16, 1936, which shall be deemed to be incorporated herein, and nothing herein contained shall be deemed a surrender by the carrier of~~

158 ~~any of its rights or immunities or an increase of any of its responsibilities or liabilities under said Act. If any term of this bill of lading~~

159 ~~be repugnant to said Act to any extent, such term shall be void to that extent, but no further.~~

160 ~~Both to Blame Collision Clause~~

161 ~~If the ship comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the~~

162 ~~Master, mariner, pilot or the servants of the Carrier in the navigation or in the management of the ship, the owners of the goods carried~~

163 ~~hereunder will indemnify the Carrier against all loss or liability to the other non-carrying ship or her owners in so far as such loss~~

164 ~~or liability represents loss of, or damage to, or any claim whatsoever of the owners of said goods, paid or payable by the other or non-~~

165 ~~carrying ship or her owners to the owners of said goods and set off, recouped or recovered by the other or non-carrying ship or her~~

~~owners as part of their claim against the carrying ship or carrier.~~

167   25. The vessel shall not be required to enter any ice - bound port, or any port where lights or light - ships have been or are about to be with-

168 drawn by reason of ice, or where there is risk that in the ordinary course of things the vessel will not be able on account of ice to safely enter the

169 port or to get out after having completed loading or discharging.

170   26. Nothing herein stated is to be construed as a demise of the vessel to the Time Charterers.   The owners to remain responsible for the

171 navigation of the vessel, *act of pilots,* insurance, crew, and all other matters, same as when trading for their own account.

172   27. A commission of  2½ *1.25* per cent is payable by the Vessel and Owners to *General Maritime Ltd., Karachi plus 1.25% to M&F*

173 *Chartering S.A. plus 1.25% to Star Wind Shipping Inc.*.................................................................................................

174 on hire earned and paid under this Charter, and also upon any continuation or extension of this Charter.

175   28. An address commission of 2½ per cent payable to......*Charterers*.................................on the hire earned and paid under this Charter.

*Clause 29 to 115, both inclusive, as attached are to be fully incorporated in this Charter Party.*

*CHARTERERS*

STAR WIND SHIPPING INC.
For and on behalf of the Owners,
by authority from the Owners,
as non responsible brokers only.

6

# ORIGINAL

### RIDER CLAUSES TO M.V."GUSTO"/SITARA SHIPPING
### CHARTER PARTY DATED 16TH AUGUST 2005



29. Hire Payment Clause:

(A) First 15 days hire and value of estimated consumable bunker to be paid within 2 banking days after vessel's delivery and Charterers are entitled to deduct value of estimated bunker on redelivery from sufficient hire payments. Owners to have the benefit of using Charterers' agents for Owners items at no extra agency fee. Owners will settle their expenses direct with agents at the various ports. No deductions for Owners expenses to be made from hire payments.

B) Where there is any failure to make "punctual and regular payment" due to oversight or negligence or error or omission of Charterers' employees, bankers or Agents or otherwise for any reason where is absence of intention to fail to make payment as set out, Charterers' shall be given by Owners 3 (three) banking days written notice to rectify the failure and where so rectified the payment shall stand as "punctual and regular payment". If there is a failure of the bank, Charterers to have 3 banking days grace to rectify the failure. Otherwise Owners are to exercise their rights under Clause Nr. 5

C) In the event that the vessel is expected to be redelivered to the Owners prior to the expiry of the last 15 days period that would be covered by the next payment of hire, Charterers shall be entitled to effect payment of hire on the basis of the estimated time necessary to complete the service.

D) Cash money drawn by the Master shall be taken at the office of the port Agents or shall be drawn by the Master from the bank.   In the event that the Master requests delivery of cash money at the vessel, all risks and expenses involved in arranging and making such delivery of cash money to the vessel shall be borne by the Owners.

E) Notwithstanding anything contained herein to the contrary, it is understood that if at any time during the currency of this Charter the hire payment shall become due on a Saturday, Sunday or Holiday or outside normal banking hours, payment of hire may be made on the next banking day immediately following the date on which hire became due and such payment shall stand as "punctual and regular payment".

F) Charterers have the right to withhold from Charter hire during the period of this Charter such reasonable amounts due them for undisputed off-hire time, but proper supporting statements are to be sent to Owners as soon as possible and original invoice.

G) Bank for hire payment :

HSBC BANK PLC.
93 AKTI MIAOULI GREECE,
185 38, PIRAEUS - GREECE.
SWIFT
BIC: MIDL GRAA
ACCOUNT NUMBER
USD 001-055698-036
IBAN: GR2407100010000001055698036
IN FAVOUR OF MEDLINK MANAGEMENT S.A.

30. Bunkers on delivery about 145/155 MT IFO and about 27/37 MT MDO.
Charterers to take over and pay together with the first hire payment value of bunkers to be consumed for this trip i.e. 77 MT IFO and 50 MT MDO and after replenishing same to redeliver the vessel with about same bunker quantities as on delivery. Any minor differences plus/minus to be settled upon redelivery at prices both ends USD306 PMT IFO and USD542 PMT MDO. During service Charterers always to arrange bunkering to take place inside port limits or at a safe usual bunker anchorage and Charterers never to attempt to place bunkers in the vessel outside port limits or inhigh seas.

# ORIGINAL

**RIDER CLAUSES TO M.V."GUSTO"/SITARA SHIPPING CHARTER PARTY DATED 16TH AUGUST 2005**



31. Description of vessel

M/V 'GUSTO'
SID - BLT JULY/1981 - PANAMA FLAG
DWAT 5,061 MT ON ABT 6.13M SSW
LOA 96.27M - BEAM 15.50M
2/2 HO/HA - HADIMS:(1)17.53X8.40M-(2)31.20X8.40M
STEEL PONTOON HACOVERS
GRAIN ABT 5,975.29 M3 / BALE ABT 5,397.17 M3
CUBICS BREAKDOWN: GRAIN / BALE
HOLD NO.1: ABT 2,204.96 M3 / ABT 1,979.14 M3
HOLD NO.2: ABT 3,770.33 M3 / ABT 3,418.03 M3
DERRICKS 3 X 10 TS
GRT/NRT: 3,052/1,747
VSL IS $CO_2$ FITTED IN HOLDS
SPEED ABT 11 KNOTS ON ABT 7MT IFO(180CST) + ABT 1MT MDO DISTILLATE,
UNDER GOOD WEATHER CONDITION UPTO BEAUFORT FORCE 4 AND
DOUGLAS SEA STATE 3 WITH   NO ADVERSE CURRENT AND NO NEGATIVE
INFLUENCE OF SWELL.
PORT CONSUMPTION BASIS 24 HRS, IDLE ABT 1MT MDO DISTILLATE AND WHEN
GEAR WORKING ABT 1.75MT MDO DISTILLATE.
VSL TO HAVE LIBERTY OF USING MDO WHEN ENTERING/LEAVING PORT, ENGINE
STARTING/STOPPING, MANEUVERING IN SHALLOW/NARROW ATERS, CANALS,
RIVERS, AND AT OTHER LIMITED OCCASIONS.
NEXT D/D: FEB/2007
NEXT S/S: MAR/2009
CLASS: CHINA CLASSIFICATION SOCIATY
PNI CLUB: THE AMARICAN P+I CLUB
CONSTANTS EXCL FW ABT 80 MT
ALL DETAILS ARE 'ABOUT+WOG'

FULL STYLE OF ORIGINAL OWNERS: GUSTO SHIPPING S.A. OF   PANAMA
MANAGERS: MEDLINK MANAGEMENT SA, PIRAEUS
                        PHONE: +30 210 4539425
                        FAX: + 30 210 4183367
                        E-MAIL: medlink@hol.gr

32. Deleted.

33. Charterers to have benefit of any return insurance premium receivable by Owners from their Underwriters, as and when received from Underwriters, by reason of the vessel being in port for a minimum period of 30 days, if on full hire for this period and pro-rata for the time actually on-hire.

34. Joint on-off hire survey are to be held to ascertain the quantities of bunkers on delivery and redelivery respectively.
The on-hire survey is to be held at the first port delivery or first load port in Owners time if vessel actually delays due to the survey. The off-hire survey is to held at the redelivery port in Charterers' time .

# ORIGINAL

## RIDER CLAUSES TO M.V."GUSTO"/SITARA SHIPPING
## CHARTER PARTY DATED 16TH AUGUST 2005

35. Both parties to have the option of canceling this Charter Party with reasonable notice if War breaks out between any two or more of the following countries to such an extent as to render the continuation of the Charter Party impossible and provided that vessel is cargo free : U.S.A., Great Britain, Japan, the People's Republic of China, France, Republic of Korea, North Korea, Russia, Germany.

36. Should the vessel put back whilst on voyage by reason of an accident or breakdown or deviation upon the course of the voyage caused by sickness of or any accidents to the crew or any person on board the vessel other than persons traveling at the request of the Charterers, or by reason of the refusal of the Captain or crew to perform their duties, the hire shall be suspended from the time of putting back until she be again in the same position or equidistant position and resumes the voyage.

Bunkers consumed during such period shall be for Owners' account.
Especially the following events to be deemed as off-hire until the vessel be again in the same or equivalent position and resumed the voyage :

A)   In the event of deviation from loading invalid crew and/or stowaway and from salvage.
B)   In the event of loss of time strike of the crew.
C)   In the event of deviation by proven oil pollution.

37. Charterers shall not in any event be liable for claims in connection with stevedore damages suffered by the vessel and/or equipment unless :

A) Master advises Charterers or their Agents in writing or by cable or telex or e-mail within 24 hours of occurrence of any damage for which Master considers Charterers liable so that Charterers may claim against stevedores, or parties responsible. Such notice to specify the damage in detail and to invite the charterers to appoint a surveyor to assess the extent of such damage. In case of hidden damage, same to be reported as soon as discovered, but always prior to redelivery.

B) Master has endeavored to hold stevedores, or parties responsible for damage, liable in writing, directly, or via Charterers agents, with a copy to the Charterers.

C) Such damages are supported by master's written damage report in copy upon which Master has endeavored to obtain the counter - signature of the stevedores, or parties responsible for the damage.

If extent of damage cannot be ascertained on occurrence, Owners/Master must report occurrence of damage in accordance with (A), (B), and (C) as above and details may follow when examination possible.   If at time of redelivery there remains outstanding damage for which Charterers are liable but which, without affecting the class or seaworthiness or trading capabilities of the vessel, can be repaired by Owners at any convenient time after redelivery, Owners undertake to accept redelivery under Clause No.4 of this Charter Party.

If redelivery is accepted as above, Charterers undertake to reimburse Owners cost of repairs as ascertained later by mutually agreed surveyor when repairs carried out.

If damage incurred affects the vessel's class or seaworthiness or trading capabilities immediate repairs, as ordered by the vessel's class surveyor, must be carried out before the sailing of the vessel. All and any expenses incurred, including port charges and costs for repairs such damage, and time lost, to be for Charterers' account.

# ORIGINAL

## RIDER CLAUSES TO M.V."GUSTO"/SITARA SHIPPING
## CHARTER PARTY DATED 16TH AUGUST 2005

38. Vessel to be delivered with valid deratisation certificate or deratisation exemption certificate on board and if this does not cover the whole period of time-charter Owners to undertake to carry out all necessary steps to renew such certificate and costs of same and detention to be for Owners' account.

39. Owners and Master to undertake best efforts to co-operate with Charterers for best stowage of cargo. Owners and Master also undertake to co-operate with Charterers in taking necessary steps for cargo fumigation, if necessary, subject receiving clear and proper instructions from Charterers to this respect at Charterers' time and expenses and responsibility.

40. Vessel to possess the necessary certificate to comply with safety and health regulations and current requirements at all ports of call.

41. Cargo exclusions: Pitch, creosoted products, blackpowder, dynamite, blasting caps, TNT, coprs, ferrosilicon, alumina, caustic soda, borax, zinc ashes, radioisotopes, radioactive products, naphtha, ammonium nitrate, direct reduced ironore and direct reduced ironore pellets, arms and ammunitions, explosives, acids, corrosives, hot briquette ironore and hot briquette ironore pellets, fishmeal, nuclear substances, sunflower seed expellers, livestock, cement, concentrates, scrap, motorblocks and turnings, needle coke, resin, petroleum tar and petroleum derivatives or its products, asbestos, calcium carbite, salt petre, hides, toxic and/or chemical waste, motorspirit, silversand, turpentine, all oil cake seed expellers, sulphate, detonator caps, sponge iron, meat bone meal, silica sand, iron briquettes, tar or any of its products, sulphur, oil expellers, NPK except the fertilizer grade, needle calcined petcoke, needle calcinated petcoke, caravans, asphalt, calcium carbite/chloride, metal turnings/shavings/borings, bones, hydrochloride, hypochloride, shavings, yellow phosphorus, any inflammable dangerous or injurious cargoes, always excluding IMO cargoes, grain in bulk.
All cargoes always to be loaded, stowed, carried and discharged in accordance with IMO/SOLAS recommendations of code of safe practice for solid bulk cargoes.
Cargo intention under this charter bagged soyabean meal or bagged rice and/or lawful, harmless, non dangerous generals.

42. Charterers to have the option to arrange a superficial inspection at any time, Owners or Master giving every facility to carry it out.

43. Deleted.

44. BIMCO Standard War Risks Clause for Time Charter, 1993
    Code Name : "CONWARTIME 1993"

    1. For the purpose of this Clause, the words :
        a) "Owners" shall include the shipowners, bareboat charterers, disponent owners, managers of other operators who are charged with the management of the Vessel, and the Master; and
        b) "War Risks" shall include any war (whether actual or threatened), act of war, civil war, hostilities, revolution, rebellion, civil commotion, warlike operations, the laying of mines (whether actual or reported), acts of piracy, acts of terrorists, acts of hostility or malicious damage, blockades (whether imposed against all vessels or imposed selectively against vessels of certain flags or ownership, or against certain cargoes or crews or otherwise howsoever), by any person, body, terrorist or political group, or the Government of any state whatsoever, which, in the reasonable judgement of the Master and/or the Owners, may be dangerous or are likely to be or to become dangerous to the Vessel, her cargo, crew or other persons on board the Vessel.

# ORIGINAL

### RIDER CLAUSES TO M.V."GUSTO"/SITARA SHIPPING
### CHARTER PARTY DATED 16TH AUGUST 2005

2. The Vessel, unless the written consent of the Owners be first obtained, shall not be ordered to or required to continue to or through, any port, place, area or zone (whether of land or sea), or any waterway or canal, where it appears that the Vessel, her cargo, crew or other persons on board the Vessel, in the reasonable judgement of the Master and/or the Owners, may be, or are likely to be, exposed to War Risks. Should the Vessel be within any such place as aforesaid, which only becomes dangerous, or is likely to be or to become dangerous, after her entry into it, she shall be at liberty to leave it.

3. The vessel shall not be required to load contraband cargo, or to pass through any blockade, whether such blockade be imposed on all vessels, or is imposed selectively in any way whatsoever against vessels of certain flags or ownership, or against certain cargoes or crews or otherwise howsoever, or to proceed to an area where she shall be subject, or is likely to be subject to a belligerent right or search and/or confiscation.

4. a) The Owners may effect war risks insurance in respect of the Hull and Machinery of the Vessel and their other interests (including, but not limited to, loss of earnings and detention, the crew and their Protection and Indemnity Risks), and the premiums and/or calls therefor shall be for their account.

   b) If the Underwriters of such insurance should require payment of premiums and/or calls because, pursuant to the Charterers' orders, the Vessel is within, or is due to enter and remain within, any area or areas which are specified by such Underwriters as being subject to additional premium because of War Risks, then such premiums and/or calls shall be reimbursed by the Charterers to the Owners at the same time as the next payment of hire is due.

5. If the Owners become liable under the terms of employment to pay to the crew any bonus or additional wages in respect of sailing into an area which is dangerous in the manner defined by the said terms, then such bonus or additional wages shall be reimbursed to the Owners by the Charterers at the same time as the next payment of hire is due.

6. The Vessel shall have liberty : –

   a) to comply with all orders, directions, recommendations or advice as to departure, arrival, routes, sailing in convoy, ports of call, stoppages, destination, discharge of cargo, delivery, or in any other way whatsoever, which are given by the Government of the Nation under whose flag the vessel sails, or other Government to whose laws the Owners are subject, or any other Government, body or group whatsoever acting with the power to compel compliance with their orders or directions;

   b) to comply with the order, directions or recommendations of any war risks underwriters who have the authority to give the same under the terms of the war risks insurance;

   c) to comply with the terms of any resolution of the Security Council of the United Nations, any directives of the European Community, the effective orders of any other Supranational body which has the right to issue and give the same, and with national laws aimed at enforcing the same to which the Owners are subject, and to obey the orders and directions of those who are charged with their enforcement;

   d) to divert and discharge at any other port any cargo or part thereof which may render the Vessel liable to confiscation as a contraband carrier;

   e) to divert and call at any other port to change the crew or any part thereof or other persons on board the Vessel when there is reason to believe that they may be subject to internment, imprisonment or other sanctions.

7. If in accordance with their rights under the foregoing provisions of this Clause, the Owners shall refuse to proceed to the loading or discharging ports, or any one or more of them, they shall immediately inform the Charterers.  No cargo shall be discharged at any alternative port without first giving the Charterers notice of the Owners' intention to do so and requesting them to nominate a safe port for such discharge. Failing such nomination by the Charterers within 48 hours of the receipt of such notice and request, the Owners may discharge the cargo at any safe port of their own choice.

8. If in compliance with any of the provisions of sub-clauses (2) to (7) of this Clause anything is done or not done, such shall not be deemed a deviation, but shall be considered as due fulfillment of this Charter party.

# ORIGINAL

### RIDER CLAUSES TO M.V."GUSTO"/SITARA SHIPPING
### CHARTER PARTY DATED 16TH AUGUST 2005



45. All holds on arrival at Charterers first load port to be clean swept and dried up in every respects to load Charterers intended cargo and to pass relevant surveyors/authorities inspection.

If fails to pass such inspection vessel to be placed off-hire until reinspection passed and all substantiated expenses arising therefrom to be for Owners' account. It is however understood and agreed that should holds partially failed such inspection and loading operations take place in those compartments passed then the time will count pro rata to the number of gangs used for loading.

In lieu of holds cleaning on redelivery the Charterers to pay Owners USD2,000.00 lumpsum excluding removal/disposal of all dunnage/lashing material/debris/etc. which Charterers confirm will remove from the ship prior redelivery.

Charterers to pay Owners lumpsum USD1,000 per months or pro rata for all victualling/cable charge and entertainment.

46. Owners to advise Charterers full name of Master when fixture is confirmed and Owners to give advance notice to Charterers with full name of new Master when Owners decide to change Master.

47. Charterers to undertake to keep Owners and Master informed during the period as regards the itinerary of the vessel and the name of their Agents at ports of call.

48. Charterers' agent to attend vessel's minor usual services free of charge but all expenses incurred to be for Owners' account.

49. Upon Charterers request the Master to authorize the Charterers and/or their agents to sign Bills of Lading on behalf of Master in accordance with Mate's or Tally's receipts without prejudice to this Charter Party.

50. Owners/Master to give notice to Charterers expected time of delivery and expected quantities of IFO and MDO remaining on board at time of delivery, upon fixing and updated expected delivery date as applicable prior to date of delivery.

51. Owners' P & I Club is The American P+I Club
    Charterers have the benefit of Owners' P and I Club so far as the rules permit.

52. Throughout the period of this Charter vessel will have on board current valid and up-to-date certificate and will so comply with all applicable requirements, regulations and recommendations.

Any delay caused by non-compliance with the aforesaid or lack of proper documentation and/or certificates required will be considered off-hire and all expenses resulting from such delay, including bunkers consumed during this period, will be for Owners' account.

53. If the vessel is off-hire due to Owners/vessel's default for a consecutive period of 20 days, Charterers have the right to cancel this Charter Party without any further obligation under this contract on the party of Charterers, provided no cargo remaining on board.

# ORIGINAL

## RIDER CLAUSES TO M.V."GUSTO"/SITARA SHIPPING
## CHARTER PARTY DATED 16TH AUGUST 2005



54. Any taxes/dues/expenses due to vessel's registry Ownership/crew/flag/absence of certificate to be for Owners' account.
Any and all other taxes, due commissions and or wharfages to be for Charterers' account.

55. In the event of breakdown of derricks by reason of disablement or insufficient power, the hire to be reduced pro-rata for the period of such an insufficiency in proportion to the number of working hatches at the time of breakdown of equipment.

If Charterers elect to continue work on hatch or hatches affected by breakdown by hiring shore appliances, Owners are to pay for shore appliances but in such case Charterers are to pay full hire for all time shore appliances are working.
Any stevedoring and/or labour charges additionally occurring due to breakdown of vessel's equipment, unless the clause of breakdown of derricks in attributed to stevedoring damage in which case vessel will remain on full hire, including costs for standby of stevedore, labour to be for Owners' account.  Prior Charterers hiring shore appliances, to give 12 hours to Owners to repair vessel's derricks.
Charterers to seek Master's approval prior hiring of shore appliances which not to be unreasonably withheld.

56. From the date of coming into force of the International Safety Management (ISM) Code in relation to the vessel and thereafter during the currency of this Charter Party, the Owners shall procure that the vessel and "the company" (as defined by the ISM Code) shall comply with the requirements of the ISM Code.  Upon request the Owners shall provide a copy of relevant document of compliance (DOC) and Safety Management Certificate (SMC) to the Charterers.
Except as otherwise provided in this Charter Party, loss, damage, expense or delay caused by failure on the part of "the company" to comply with the ISM Code shall be for Owners' account.

57. Deleted.

58. Deleted.

59. Liability for cargo claims shall be borne by Owners/TimeCharterers in accordance with the Interclub New York Produce Exchange Agreement in February 1970 and reprints of May 1972 and latest amendments of May 1984.  No party is authorized to proceed with the settlement of any cargo claims or grant time extensions unless the other party's written approval has been obtained. Neither party shall between themselves refer to the one year time limit as a defence.

60. Deleted.

61. Any delay, expenses and/or fines incurred on account of smuggling if caused by Master, Officers and/or crew to be for Owners' account and if caused by Charterers' servants or representatives to be for Charterers' account.

# ORIGINAL

RIDER CLAUSES TO M.V."GUSTO"/SITARA SHIPPING
CHARTER PARTY DATED 16TH AUGUST 2005



62. Deleted.

63. Charterers and their supercargoes to have the right of using the vessel's means of communication. (See Clause 10)

64. Notwithstanding anything contained in the Charter Party, whether printed or written, in no case crew is to be required to drive vessel's winches/derricks for cargo operations. Without any responsibility to the Owners, Charterers at their time and risk will employ and pay for experienced shore winchmen to drive the winches/derricks for cargo operations.

65. Owners to supply fresh water at their account during this Charter except if the same used for Charterers' business, which to be for Charterers' account.

66. Vessel uses Diesel Oil in main engine when entering/leaving port and when maneuvering in narrow/shallow/ restricted water.

67. Owners guarantee that vessel's hatchcovers are to be watertight all throughout this Charter period and if any hatchcovers found defective, same to be rectified at Owners' time and expenses to independent surveyor satisfaction.

68. Cargo gear to be in fully efficient state throughout the currency of the Charter Party.

69. Owners warrant that vessel's holds are clear of any fittings/superstructures such as car deck/curtain plates whatsoever.

70. Should the vessel be arrested during the currency of this Charter at the suit of any person having or purporting to have a claim against or any interest in the vessel, the hire is to be suspended for any period that the vessel remains under arrest, unless still available for use by Charterers, or remains unemployed as the result of such arrest and Owners shall reimburse to Charterers any proven expenditure and consecutive loss incurred due to the arrest.

71. In case original Bills of Lading not available prior to vessel arrival at discharge port, Owners to allow discharge/delivery of the cargo against Charterers' L.O.I. in Owners P+I Club Standard wording issued on the Charterers letter head and stamped/signed by a designated official of the Charterers only, without bank counter signature.
The Charterers will fax the L.O.I. together with copy of the Bills of Lading which will be issued to manager's office in Greece (FAX NR. 210-4528766) for their approval. Thereafter the Charterers will immediately send by courier mail the original L.O.I., faxing also the courier airway bill to Owners managers. This procedure to take place promptly enough prior to vessel's arrival at destination, being understood that the Owners will instruct the Master to release the cargo only after having found all in order and after having received Charterers fax with the courier airway bill. Furthermore Charterers hereby undertake the obligation to mail the original accomplished Bills of Lading to Owners managers when same available but latest within two months after redelivery in which case Owners/Managers will courier back to Charterers. This clause applies accordingly in case of changing destination/port other than that mentioned in Bills of Lading.



# ORIGINAL
## RIDER CLAUSES TO M.V."GUSTO"/SITARA SHIPPING
## CHARTER PARTY DATED 16TH AUGUST 2005

72. Normal quarantine time and expenses for vessel entering port(s) to be for Charterers' account, but any time of detention and expenses for quarantine due to pestilence, illness etc., of Master/Officers/crew to be for Owners' account unless it is because of the cargo carried or the ports visited whilst under present charter in which case to be for Charterers' account.

73. Watchmen charges, if any, shall be borne, by party arranged/orders the same unless it is compulsory in which case to be for Charterers' account.

74. Vessel's cargo gear and all other equipment shall comply with the regulations of the country in which vessel, will be employed and Owners to ensure that the vessel is at all times in possession of valid and up-to-date certificates of efficiency to comply with such regulations. Gear certificates to be shown to Charterers or their Agents if required.

If stevedore, longshoremen or other workmen are not permitted to work due to failure of Master and/or Owners and/or Owners' Agents to comply with the aforementioned regulation or because vessel is not in possession of such valid and up-to-date certificates of efficiency, then Charterers may suspend hire for the time thereby lost.

75. Owners guarantee that vessel is not blacklisted by any Arab league countries.

76. All negotiation and eventual fixture to be kept private and confidential.

77. Deleted.

78. Deleted.

79. Trading Exclusions
Sweden, Norway, Iceland, Finland, Denmark, Syria, Former Yugoslavia, Turkish Occupied Cyprus, Azov Sea between 15th November through 15th may, North and South America, West Africa, Cambodia, North Korea, Australia, New Zealand, Cuba, Georgia including Abkhazia, Hokkaido, any war and/or war like areas/any countries to which U.S.A./U.N. Sanctions from time to time are imposed.

80. Greenwich mean time to be applicable for charter hire calculation.

81. Additional premium on cargo insurance due to vessel's age and flag to be for Charterers' account.

83. Deleted.

84. Deleted.



# ORIGINAL
## RIDER CLAUSES TO M.V."GUSTO"/SITARA SHIPPING
## CHARTER PARTY DATED 16TH AUGUST 2005

85. Charterers to use lashing materials free of expenses as on board which if not available then same will be supplied by the Charterers.

86. Deleted.

87. Deleted.

88. If vessel calls CIS Pacific port, then prior to vessel sailing from the port, Charterers to obtain on Owners time and expense a certificate of GYPSY MOTH freedom issued by a recognised government quarantine Agency approved by the authorities of Canada, U.S.A. Australia, and New Zealand.

89. Owners/Master to give Charterers on fixing notice of vessel's expected delivery.

90. New Both to Blame Collision Clause, New Jason Clause, U.S.A. Clause Paramount. Chamber of Shipping Nuclear Clause and Chamber of Shipping Clause Paramount as per attached shall be incorporated in this Charter Party, New Both to Blame Collision clause, New Jason Clause, Clause Paramount which to incorporate the Hague and Hague-Visby rules shall be included in all Bill(s) of Lading issued under this Charter Party.

91. Deleted.

92. Owners to have liberty to bunker for Owners account in Charterers time provided this does not interfere with Charterers business and to notify Charterers of their intention at least 72 hours prior to such bunkering taking place or as mutually agreed.

93. Deleted.

94. Deleted.

95. Deleted.

96. Owners to warrant vessel is a single deck bulk carrier and can load a full and complete cargo in each hold according to the latest SOLAS Regulations. Vessel is not grain fitted.

97. Owners warrant that the vessel has not traded with Cuba during the last 24 months and has never called North Korea.



# ORIGINAL

RIDER CLAUSES TO M.V."GUSTO"/SITARA SHIPPING
CHARTER PARTY DATED 16TH AUGUST 2005

98. Charterers may supply an independent weather routing company's advises to Master during the voyages specified by Charterers. Master shall comply with the routing procedure of the routing services selected by Charterers but always subject to Master's discretion for the safety of the vessel and the actual weather prevailing evidence of weather condition shall be from the vessel's log books, which shall be taken as ruling.

99. During this charter Charterers guarantee that all cargoes will be loaded/stowed/trimmed/carried/ discharged at Charterers' time/risk/expense in conformity with IMO/local/national/international rules and regulations and in accordance with vessel's class certificate and always to Master's satisfaction.

100. Owners guarantee vessel is suitable for grab discharging as far as a vessel of her size/type can be and bulldozer operation in holds provided the weight of grabs/bulldozers is compatible to vessel's tank top strength.

101. Charterers guarantee that they are fully covered with a first class P&I Club including cargo claims, Freight/Demurrage & Defence and full Charterers' liability and will remain so for the total duration of the present charter. Charterers' +&I Club is…………………………..

102. Vessel has no relation to Ex-Yugoslavia in vessel's flag/ownership/crew/etc.

103. Deleted.

104. Owners confirm that Master can speak English well not affecting Charterers smooth operation and if there some communication problem happened due to Master non ability in speaking English Owners should change Master immediately upon Charterers request.

105. No dry dock during whole this Charter Party except emergency and / or required by vessel's class and Owners confirm the ship will not be sold during current Charter Party period.    Charterers have the option of adding any time the vessel is off-hire to the Charter Period.

106. In the event that steel cargo be loaded under this Charter Party, the Owners have the option to appoint a surveyor through their P and I Club to carry out a pre-loading condition survey on the cargo and expenses shall be for Owners account.    Charterers are to give Owners not less then 72 hours notice, Saturdays and Sundays excluded, of the intention to load steel cargo.

107. In the event of loss of time due to boycott of the vessel by shore labour, linesmen, pilots and tug-boats or arising from government restrictions by reason of the terms and conditions of which captain, officers and members of the crew are employed or other events immobilizing the vessel, payment of hire shall cease for the time thereby lost and all extra expenses directly incurred to be for Owners account.

108. Deleted.

# ORIGINAL

## RIDER CLAUSES TO M.V."GUSTO"/SITARA SHIPPING
## CHARTER PARTY DATED 16TH AUGUST 2005

109. Basic annual   war risk insurance premium to be for Owners' account, however, in the event of any increase in war insurance premia (H&M/P&I), including loss of hire and crew war rist bonus as well as blocking and trapping, due to the trade in which vessel is engaged, same to be for Charterers' account until additional war risk insurance premia no longer apply. Owners will submit to charterers the relevant debit notes immediately upon receipt of same from the insurance brokers which the Charterers undertake to settle together with the next scheduled payment, without delay, as per the governing Charter Party.

110. Hamburg Rules Protection Clause
Neither the Charterers nor their agents shall permit the issue of any Bills of Lading or any waybills whether or not signed on their behalf or on behalf of the Owners voluntarily incorporating the Hamburg Rules or any legislation under which the Hamburg Rules are compulsorily applicable in respect of any contract of carriage under or during the period of this Charter or any sub-Charter.

In the event that the Owners sustain a liability arising from the application of the Hamburg Rules in circumstances where those rules were not compulsorily applicable and where the Owners would not otherwise have sustained a liability then the Charterers shall indemnify the Owners for all loss and damage sustained thereby.

Should the Charterers direct the vessel to countries where the Hamburg Rules are compulsorily applicable or otherwise cause the contracts of carriage under Bills of Lading or waybills to be subject to the Hamburg Rules and should the Owners thereby sustain a liability, then the Charterers shall indemnify the Owners for all loss and damage in excess of the loss and damage which the Owners would have sustained if the Hague or Hague Visby rules had applied.

111. Liner time ice clause as protective clause to be included

112. General Average and Arbitration in London. This Charter Party shall be governed by and construed in accordance with the English law.

113. No liner/throught/transshipment or combined transport Bills of Lading and no waybills are to be issued under this Charter Party,   The Charterers have the option to issue liner Bills of Lading, but the vessel to enter the loading/discharging port only after  confirmation of the respective agents that port expenses/disbursements and liner cost covered by the Charterers, however in case any delay occur in lieu thereof full time will count.

114. Charterers option to weld padeyes on deck/hatch cover/in holds at Charterers time/expenses and to remove same prior to redelivery having repainted all such points to Master's satisfaction. Otherwise Charterers option to redelivery vessel without removing the padeyes by paying USD10 (ten) per each padeye.

115. Charterers option to load intended cargo on deck/hatch covers at Charterers' time/expense/risk in accordance with vessel's deck/hatch covers strength and vessel's stability at Master's discretion.
All Bills of Lading issued for such cargo to be claused 'Carried on deck without liability to the carrier for loss or damage howsoever caused.'

/// E N D ///



# ORIGINAL

**RIDER CLAUSES TO M.V."GUSTO"/SITARA SHIPPING
CHARTER PARTY DATED 16TH AUGUST 2005**

## U.S.A. CLAUSE PARAMOUNT

This Bill of Lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the United States, approved 16 April, 1936, which shall be deemed to be incorporated herein, and nothing herein contained shall be deemed a surrender by the carrier of any of its rights or immunities or an increase of any of its responsibilities or liabilities under said Act.    If any term of this Bill of Lading be repugnant to said Act to any extent, such term shall be void to that extent, but not further.

## CHAMBER OF SHIPPING NUCLEAR CLAUSE

Notwithstanding any other provision contained in this Charter it is agreed that nuclear fuel or radioactive products or waste are specifically excluded from the cargo permitted to be loaded or carried under this Charter Party.

This exclusion does not apply to radio-isotopes used or intended to be used for any industrial, commercial, agricultural, medical or scientific purpose, provided Owners' prior approval has been obtained to the loading thereof.

## CHAMBER OF SHIPPING CLAUSE PARAMOUNT

Notwithstanding anything herein contained no absolute warranty of seaworthiness is given or shall be implied in this Charter-Party and it is expressly agreed that the Owners shall have the benefit of the "Rights and immunities" in favour of the carrier or ship and shall assume the "Responsibilities and Liabilities" contained in the enactment in the country of shipment giving effect to the rules set out in the international Convention for the unification of certain rules relating to Bills of Lading : dated Brussels the 25th August, 1924 (the "Hague Rules").    If no such enactment is in force in the country of shipment the Terms of Articles III & IV shall apply.
Notwithstanding the provisions of any such claim shall be limited to Stg. 200 Lawful money of the United Kingdom per package or unit of cargo (unless the nature and value of such cargo have been declared by the Shipper before loading and inserted in the Bills of Lading) notwithstanding that some other monetary limit is laid down by the legislation to which the contract of carriage is subject.

If any provision of this Charter Party shall be repugnant to the said rules to any extent, such provisions shall be void to that extent, but no further.    Any Bill of Lading issued pursuant to this Charter Party shall contain a Clause Paramount incorporating the Hague Rules whether they are compulsorily applicable or not.



# ORIGINAL

### RIDER CLAUSES TO M.V."GUSTO"/SITARA SHIPPING
### CHARTER PARTY DATED 16TH AUGUST 2005

### NEW JASON CLAUSE

In the event of accident, danger, damage or disaster before or after the commencement of the voyage, resulting from any cause whatsoever whether due to negligence or not, for which or for the consequence of which, the carrier is not responsible by statute, contract or otherwise, the goods, shippers, consignees or Owners of the goods shall
contribute with the carrier in general average to the payment of any sacrifices, lossesor expenses of a general average nature that may be made or incurred and shall pay salvage and special charges incurred in respect of the goods.

If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully as if the such salving ship or ships belonged to strangers.   Such deposit as the carrier or his agents may deem sufficient to cover the estimated contribution of the goods and any salvage and special charges thereon shall, if required, be made by the goods, shippers consignees or Owners of the goods to the carrier before delivery.

### NEW BOTH TO BLAME COLLISION CLAUSE

If the liability for any collision in which the vessel is involved while performing this Charter Party falls to be determined in accordance with the laws of the United States of America, the following clause shall apply :

"If the ship comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the Master, Mariner, Pilot or the servants of the carrier in the navigation or in the management of the ship, the Owners of the goods carried hereunder will indemnify the carrier against all loss or liability to the other or non carrying ship or her Owners in so far as such loss or liability represents loss of or damage to, or any claim whatsoever of the Owners of the said goods, paid or payable by the other or noncorroding ship or her Owners to the Owners of the said goods and set off, recouped or recovered by the other or non-carrying ship or her Owners as part of their claim against the carrying ship or carrier."

"The foregoing provisions shall also apply where the Owners, Operators or those in charge of any ship or ships or objects other than, or in addition to, the colliding ships or objects are at fault in respect of a collision or contact".

# ORIGINAL

### ADDENDUM NO.1
### TO
### CHARTER PARTY MV GUSTO/SITARA SHIPPING DATED 16TH AUGUST
### 2005

It is this day mutually agreed between,

Messrs GUSTO SHIPPING S.A., Panama as Owners
                    and
Messrs SITARA SHIPPING LTD., Esplanade School Bldge., 3rd floor, Room nr.2,3,4, 160 DN Road, Fort, Fort, Mumbai-400 001 as Charterers
                    that
The Charterers have the right to proceed with loading cargo at Mumbai which is destined for Dammam, Saudi Arabia. Thereafter Charterers can load completion cargo from one safe port Arabian Gulf to Red Sea.
Subsequent to this agreement it is further agreed that:
1. Somalia is entered in the list of countries excluded for the vessel to call during this charter.
2. The Charterers to compensate Owners with 'one day's hire' which to be added to the next scheduled hire instalment.
3. The Charterers to provide proof that the first hire instalment plus value of bunkers on delivery remitted as per Charter Party.
4. For calling Saudi Arabia the Charterers undertake the responsibility to arrange all needful in respect of formalities required to discharge cargo as well as any extra cargo related expenses/delays in lieu thereof will be for Charerers' account.

All other terms, conditions and exemptions of the Charter Party dated 16th August 2005 to remain unaltered and in full force.

Mumbai 29th August 2005

THE OWNERS                                THE CHARTERERS

STAR WIND SHIPPING INC.
For and on behalf of the Owners,
by authority of the Owners, as
non responsible brokers only.

## IN THE MATTER OF THE ARBITRATION ACT 1996

## AND

## IN THE MATTER OF AN ARBITRATION

## BETWEEN

| | |
|---|---|
| **GUSTO SHIPPING S.A.**<br>of Panama | **Claimants**<br>**(Owners)** |

## AND

| | |
|---|---|
| **SITARA SHIPPING LIMITED**<br>of Mumbai, India | **Respondents**<br>**(Charterers)** |

### m.v. "GUSTO"

### Charterparty dated 16th August 2005

### FINAL ARBITRATION AWARD

### WHEREAS:

1.      By a Charterparty on an amended New York Produce Exchange form, concluded and dated Karachi, 16th August 2005, the Claimants (hereinafter referred to as the "Owners") chartered their vessel, m.v. "Gusto", to the Respondents (hereinafter referred to as the "Charterers") for one time charter trip, always afloat, always accessible, always within I.W.L. via safe port(s), safe berth(s), safe anchorage(s) via 1 safe berth Mumbai to 1 safe berth Elmaan with duration of about 25 – 35 days without guarantee, with delivery on dropping la[st]

EXHIBIT

B

*Page 2*

outward sea pilot Mumbai, any time day or night, Sundays and holidays included, with subsequent re-delivery on dropping last outward sea pilot 1 safe port East Africa or Red Sea, in Charterers' option, any time day or night, on the terms and conditions more particularised therein.

2.     Clause 17 and Additional Clause 112 provided that should disputes arise the same were to be referred to arbitration in London under English Law and provided, inter-alia, as follows:

### Clause 17

*"This Charterparty shall be governed by and construed in accordance with English Law and any dispute arising out of this Charterparty shall be referred to arbitration in London in accordance with the Arbitration Act 1996 or any statutory modification or re-enactment thereof for the time being in force. Unless the parties agree upon a Sole Arbitrator, one Arbitrator shall be appointed by each party and the Arbitrators so appointed shall appoint a third Arbitrator, the decision of the three-man Tribunal thus constituted or any two of them, shall be final. On the receipt by one party of the nomination in writing of the other party's Arbitrator, that party shall appoint their Arbitrator within 14 days, failing which the decision of the single Arbitrator appointed shall be final. The Arbitrators shall be members of the London Maritime Arbitrators Association. For disputes where the total amount in dispute does not exceed the amount of US $50,000 the arbitration shall be conducted in accordance with the Small Claims Procedure of the London Maritime Arbitrators Association."*

### Clause 112

*"General Average and arbitration in London. This Charterparty shall be governed by and construed in accordance with English Law."*

3.      Disputes having arisen, more particularised below, the Owners appointed me, the undersigned William Robertson of The Atlas Room, 37 Woodpecker Crescent, Burgess Hill, West Sussex, RH15 9XY, as their appointed Arbitrator.

However, the Charterers failed to appoint an Arbitrator of their choice, pursuant to the terms and conditions of the Arbitration Act 1996, and I subsequently accepted appointment as Sole Arbitrator in the reference.

However, subsequently, the parties agreed to my appointment as Sole Arbitrator in the reference, pursuant to the LMAA Small Claims Procedure 2006.

I am a full member of the London Maritime Arbitrators Association, a commercial man and a member of the Baltic Exchange in London.

4.      The seat of the arbitration is London, England.

5.      The dispute referred to the undersigned concerned a claim by the Owners in respect of a balance on final hire accounts in a sum of US $12,079.67, together with interest and costs.

The Charterers denied liability and counterclaimed a balance on final hire accounts in a sum of US $26,170.00, together with interest and costs.

6.      I received written submissions from London solicitors representing the Owners and from Indian solicitors representing the Charterers. The parties were content that I proceed to an Award on the basis of the written submissions alone without an oral attended hearing. Neither of the parties requested a Reasoned Award.

NOW I, the said William Robertson, having taken upon myself the burden of Sole Arbitrator in relation to the disputes between the parties, and having read the written submissions and documents produced to me, and having weighed and considered the facts and the evidence, **DO HEREBY MAKE, ISSUE AND PUBLISH** this my **FINAL ARBITRATION AWARD** as follows:

*Page 4*

**I FIND AND HOLD** that the Owners' claim in respect of an outstanding balance on final hire accounts succeeds in the sum of US $9,879.46.

The Charterers' counterclaim in respect of a final balance on final hire accounts fails in its entirety and is hereby dismissed.

**I AWARD AND ADJUDGE** that the Charterers shall forthwith pay to the Owners the sum of US $9,879.46 (Nine Thousand, Eight Hundred and Seventy-Nine United States Dollars and Forty-Six Cents), together with interest thereon at a commercial rate of 7% per annum from 1st November 2005, compounded at three monthly intervals until the date of payment.

**I FURTHER AWARD AND ADJUDGE** that the Charterers shall bear and pay their own and the Owners' recoverable costs of the reference, which **I HEREBY DETERMINE**, in accordance with the LMAA Small Claims Procedure 2006, in a sum of £2,000 and further that the Charterers shall also bear and pay the cost of this **FINAL ARBITRATION AWARD**, which **I HEREBY DETERMINE AND SETTLE** in the sum of £1,500.00, which I have received, pursuant to the LMAA Small Claims Procedure 2006.

**ALWAYS PROVIDED** that if the Owners have in the first instance paid any amount in respect of the cost of this Award, they shall be entitled to immediate reimbursement from the Charterers of the sum so paid, together with interest thereon at a rate of 7.5% per annum, compounded at three monthly intervals, from the date of payment by the Owners until the date of settlement by the Charterers.

*Page 5*

**GIVEN** under my hand in London    12th April  2007

...................................
**WILLIAM ROBERTSON**

...................................
**WITNESS**

```
Print For: donald
Type.....: Email - Internet
Msg.Nr...: IN 5094
Created..: 26-Σεπ-2005 14:18
From.....: "Star Wind Shipping Inc." <starw
Subject..: GUCHRTS
Comment..: Recvd: (CPID:2/SECS:0)
```

TELiX MSG: 03C3D-00 26/09/05 13:58

STAR WIND SHIPPING INC.
9,KREVVATA STR., - 1st Floor
PIRAEUS 185 38
TEL: 210-4290460
FAX: 210-4290464
EMAIL: starwind@hol.gr


RECAP OF CLEAN FIXTURE

RE MV GUSTO/SITARA - C/P DATED 26TH SEPTEMBER 2005
----
PLSED TO CONFIRM WE ARE NOW FULLY/CLEAN FIXED FOR THE BAGGED CARGO
FROM DJIBOUTI TO MASSAWA AS FOLLS:-

=ACCT SITARA SHIPPING LTD., MUMBAI

=MV GUSTO
 AS DESCRIBED IN THE PRESENT TC/P DATED 16TH AUGUST 2005

=ON COMPLETION OF DISCHARGE OF THE TIME C/P DATED 16TH AUGUST 2005
 THE VSL SHALL BE CONSIDERED AS REDELIVERED FROM THIS C/P. THEN
 THE TIME WILL START COUNTING FOR THE LOADING OF THE VOYAGE
 CHARTER WITH BAGGED RICE.

=UPON COMPLETION OF LOADING OF THE BAGGED RICE THE TIME REQUIRED
 FROM LEAVING THIS BERTH, SHIFTING TO THE BUNKERING BERTH WHERE
 SHE WILL BE REPLENISHED THE REMAINING BUNKERS IN ORDER CHTRS TO
 MEET THEIR OBLIGATIONS AS PER THE TIME C/P DATED 16TH AUGUST 2005,
 AND THEN TO THE ANCHORAGE WHERE WILL DROP THE PILOT IS THE TOTAL
 TIME THAT CHTRS WILL PAY TO THE OWS PRORATA AT THE DAILY HIRE OF
 THE TIME C/P DATED 16TH AUGUST 2005, I.E. USD 4750.

=THE TERMS AGREED FOR THE SUBSEQUENT TRIP (VOYAGE CHARTER) AFTER
 THE TIME C/P EMPLOYMENT OF THE VSL IS AS FOLLS:-
 -MIN 1700/MAX 2000 MT OF BAGGED RICE WITH S/F 65' WOG
 -LOADING 1SP 1SAB DJIBOUTI
 -DISCHARGING 1SP 1SAB MASSAWA
 -FRT LUMPSUM USD 35,000.- FIOS BSS FREE D/A'S BENDS
 -FRT PAYABLE 100PCT TO OWS ACCT W/IN 24 HRS AFTER COL S/R 'FRT
  PAYABLE AS PER C/P' BSL BUT ANYWAY BEFORE BREAKING BULK. AT
  THE SAME TIME TO ADJUSTED OUTSTANNDINGS AGAINST THE HIRE DUE FROM
  THE OWS UNDER THE PRESENT TC/P.
 -L/D 5 DAYS TOTAL FHINC
 -FREE DASBENDS
 -OWISE AS PER 'MV ST.CRISPIAN/SITARA C/P DATED 23RD JUNE 2005'
  WITH LOGICAL AMENDMENTS
 -2.50 ADDCOM+1.25 GML+1.25 MNF+1.25 STAR WIND SHIPPING INC.

EXHIBIT

C

END RECAP

THKS VM FOR THIS FURTHER FIXTURE.

BRGDS/DAM

NNNN

| | |
|---|---|
| 1. Shipbroker.<br><br>General Maritime (pvt) Ltd., Karachi | RECOMMENDED<br>THE BALTIC AND INTERNATIONAL MARITIME CONFERENCE<br>UNIFORM GENERAL CHARTER (AS REVISED 1922 and 1976)<br>INCLUDING "F.I.O." ALTERNATIVE, ETC.<br>(To be used for trades for which no approved form is in force)<br>CODE NAME: " GENCON "                    Part I |

<table>
<tr><td colspan="2"></td><td>2. Place and date   Mumbai  23rd June 2005</td></tr>
<tr>
<td>2. Owners/Place of business (Cl. 1)<br>Crispian Marine S.A., of Panama<br>c/o Medlink Management S.A., Piraeus</td>
<td colspan="2">4. Charterers/Place of business (Cl. 1)<br>Sitara Shipping Ltd., Esplanade School Bldge., 3rd floor,<br>Room nr.2,3,4, 160 DN Road, Fort,<br>Fort, Mumbai-400 601</td>
</tr>
<tr>
<td>5. Vessel's name (Cl.1)<br>MV"ST.CRISPIAN"</td>
<td colspan="2">6. GRT/NRT (Cl. 1)<br>2,832/1,706</td>
</tr>
<tr>
<td>7. Deadweight cargo carrying capacity in tons (abt.) (Cl. 1)<br><br>DWT 4,910 MT ON 5.548 M SSW</td>
<td colspan="2">8. Present position (Cl. 1)<br><br>Trading</td>
</tr>
<tr>
<td>9. Expected ready to load (abt.) (Cl. 1)<br>Laycan 21ST – 27TH June, 2005</td>
<td colspan="2"></td>
</tr>
<tr>
<td>10. Loading port and place (Cl. 1)<br><br>1SP, 1GSBAAAA Mumbai<br>No restrictions for this vessel.</td>
<td colspan="2">11. Discharging port or place (Cl. 1)<br>Dubai/Jebel Ali/Doha or Dammam/Kuwait, in this rotation,<br>1GSBAAAA at all ports.<br>No restrictions for this vessel at all ports</td>
</tr>
<tr>
<td colspan="3">12. Cargo (also state quantity and margin in Owners' option, if agreed; if full and complete cargo not agreed state "part cargo") (Cl. 1)<br><br>Upto full and complete cargo of steel pipes/plates and/or Lawful/Harmless/Non-Dangerous generals</td>
</tr>
<tr>
<td>13. Freight rate (also state if payable on delivered or intaken quantity) (Cl. 1)<br><br>Lumpsum USD 120,000.- Free In Out Stowed/Trimmed,<br>Lashed, Dunnaged, Secured basis free of port expenses at all<br>ports of call.<br>Freight deemed earned on shipment discountless non-<br>returnable ship and/or cargo lost or not lost.</td>
<td colspan="2">14. Freight payment (state currency and method of payment; also beneficiary and<br>bank account ) (Cl. 1)<br>100% Freight payment, less address commission , plus<br>undisputed demurrage (if any) at loadingport to be paid<br>within 2. banking days after completion of loading, and<br>Charterers have received fax copy of the non negotiable<br>Original B/L's signed and marked "Freight Prepaid",<br>B/L's to be kept in the Agency custody and to be released<br>only when Owners have received the freight.<br>Demurrage/Despatch statement presentation by fax copies of<br>the original documents from load, and discharge port. to be<br>given to Owners/Charterers within 15 days of completion of<br>loading/discharging and funds to be settled within 3 banking<br>days.</td>
</tr>
<tr>
<td>15.Loading and discharging costs (state alternative (a) or (b) of Cl. 5;  also indicate if<br>vessel is gearless)<br><br>F.I.O.S.T., Lashed, Dunnaged, Secured.</td>
<td colspan="2">16. Laytime (if separate laytime for load. and disch. is agreed, fill in a) and b).<br>if total laytime for load. and disch., fill in c) only) (Cl. 6)<br><br>a) Laytime for loading</td>
</tr>
<tr>
<td rowspan="2">17. Shippers (state name and address) (Cl. 6)</td>
<td colspan="2">b) Laytime for discharging</td>
</tr>
<tr>
<td colspan="2">c) Total laytime for loading and discharging<br>10 total wwd S/FHINC</td>
</tr>
<tr>
<td>18. Demurrage/Despatch rate (loading and discharging) (Cl. 7)<br>USD 5.000,-/USD 2.500 per day/prorate</td>
<td colspan="2">19. Cancelling date (Cl. 10)<br>27th June, 2005</td>
</tr>
<tr>
<td colspan="3">20. Brokerage commission and to whom payable (Cl. 14)<br>2,5 % address commission plus 1,25 % GML, Karachi plus 1.25% M&F Chartering plus 1,25 % Star Wind Shipping Inc.</td>
</tr>
<tr>
<td colspan="3">21. Additional clauses covering special provisions, if agreed.<br><br>Clauses 22 through 47 both inclusive, see attached hereto are<br>considered fully incorporated in this Charter party.</td>
</tr>
</table>

In the event of a conflict of conditions, the provisions of Part I shall prevail over those of Part II to the extent of such conflict.

| Signature (Owners) | Signature (Charterers) |
|---|---|
| | |
| | Sitara Shipping Ltd., Mumbai |

# "Gencon" Charter (As Revised 1922 and 1976)

Including " F.I.O. ,, Alternative, etc.

1. It is agreed between the party mentioned in Box 3 as Owners of the
steamer or motor-vessel named in Box 5, of the gross/nett Register
tons indicated in Box 6 and carrying about the number of tons of deadweight
cargo stated in Box 7, now in position as stated in Box 8
and expected ready to load under this Charter about the date indicated in Box 9, and the party mentioned as Charterers in Box 4
that:
The said vessel shall proceed to the loading port or place stated
in Box 10 or so near thereto as she may safely get and lie always
afloat, always accessible and there load a full and complete cargo (if
shipment                                          deck
cargo agreed same to be at Charterers risk) as stated in Box 12
(Charterers to provide all mats and/or wood for dunnage and any
separations required, the Owners allowing the use of any dunnage
wood on board if required) which the Charterers bind themselves to
ship, and being so loaded the vessel shall proceed to the discharging port or place stated in Box 11 as ordered on signing Bills of
Lading or so near thereto as she may safely get and lie always
afloat always accessible and there deliver the cargo on being paid freight on
delivered or intaken quantity as indicated in Box 13 at the rate stated in
Box 13.

2.

**Owners' responsibility Clause**
Owners are to be responsible for loss of or damage to the goods
or for delay in delivery of goods only in case the loss, damage
or delay has been caused by the improper or negligent stowage of
the goods (unless stowage performed by shippers/Charterers or their
stevedores or their servants) or by personal want of due diligence on the part
of the Owners or their Manager to make the vessel in all respects seaworthy
and to secure that she is properly manned, equipped and
supplied or by personal act or default of the Owners or their
Manager.
And the Owners are responsible for no loss of or damage to the goods
arising from any other cause whatsoever, even if in fact so caused,
default of the Captain or crew or some other person employed by the
Owners on board or ashore for whose acts they would, but for this
clause, be responsible, or from unseaworthiness of the vessel on
loading or commencement of the voyage or at any time whatsoever Damage
caused by contact with leakage, smell or evaporation
from other goods or by the inflammable or explosive nature or insufficient package of other goods not to be considered as caused
by improper or negligent stowage, even if in fact so caused.

3.

**Deviation Clause**
The vessel has liberty to call at any port or ports in any order, for
any purpose, to sail without pilots, to tow and/or assist vessels in
all situations, and also to deviate for the purpose of saving life and/or
or property.

4.

**Payment of Freight** See Clause 13,14 and 23
The freight to be paid in the manner prescribed in Box 14 in cash
without discount on delivery of the cargo at mean rate of exchange
ruling on day or days of payment, the receivers of the cargo being
bound to pay freight on account during delivery, if required by Captain or Owners.
Cash for vessel's ordinary disbursement at port of loading to be
advanced by Charterers if required at highest current rate of exchange, subject to two per cent. to cover insurance and other expenses.

5.
**H**

**Loading/Discharging Costs**
*(a) Gross Terms*
~~The cargo to be brought alongside in such a manner as to enable
vessel to take the goods with her own tackle. Charterers to procure
and pay the necessary men on shore or on board the lighters to do
the work there, vessel only heaving the cargo on board.
If the loading takes place by elevator, cargo to be put free in vessel's
holds, Owners only paying trimming expenses.
Any pieces and/or packages of cargo over two tons weight shall be
loaded, stowed and discharged by Charterers at their risk and expense.
The cargo to be received by Merchants at their risk and expense
alongside the vessel not beyond the reach of her tackle.~~
*(b) F.I.o. and free stowed/trimmed*
The cargo shall be brought into holds, loaded and stowed and/or trimmed and taken from the holds and discharged by the Charterers or
their Agents, free of any risk, liability and expense whatsoever to the
Owners.
The Owners shall provide winches, motive power and ~~winchman from
the Crew~~ if required and permitted; if not, the Charterers shall
provide and pay for winchmen from shore and/or cranes, if any. (This
provision shall not apply if vessel is gearless and stated as such in
Box 15).
*Indicate alternative (a) or (b), as agreed, in Box 15*

6.
**H**

**Laytime** See Clause 24 and 25
*(a) Separate laytime for loading and discharging*
~~The cargo shall be loaded within number of running hours as
indicated in Box 16, weather permitting, Sundays and holidays excepted, unless used, in which event time actually used shall count.
The cargo shall be discharged within number of running hours
as indicated in Box 16, weather permitting, Sundays and holidays excepted, unless used, in which event time actually used shall count.~~
*(b) Total laytime for loading and discharging*
The cargo shall be loaded and discharged within the number of total
running hours as indicated in Box 16, weather permitting, Sundays and
holidays excepted, unless used, in which event time actually used
shall count.
*(c) Commencement of laytime (loading and discharging)*
Laytime for loading and discharging shall commence at 1 p.m. if
notice of readiness is given before noon, and at 6 a.m. next working
day if notice given during office hours after noon. Notice at loading
port to be given to the Shippers named at Box 17.
Time actual used before commencement of laytime shall count.
Time lost in waiting for berth to count as loading or discharging
time, as the case may be.
**H** *Indicate alternative (a) or (b) as agreed, in Box 16*

**Demurrage** See Clause 26
Ten running days on demurrage at the rate stated in Box 18 per
day or pro rata for any part of a day, payable day by day, to be
allowed Merchants altogether at ports of loading and discharging.

8. **Lien Clause**
Owners shall have a lien on the cargo for freight, dead -freight,
demurrage and damages for detention. Charterers shall remain responsible for dead-freight and demurrage (including damages for
detention), incurred at port of loading. Charterers shall also remain
responsible for freight and demurrage (including damages for detention) incurred at port of discharge, but only to such extent as the
Owners have been unable to obtain payment thereof by exercising
the lien on the cargo.

9. **Bills of Lading**
The Captain to sign Bills of Lading at such rate of freight as
presented without prejudice to this Charterparty, but should the
freight by Bills of Lading amount to less than the total chartered
freight the difference to be paid to the Captain in cash on signing
Bills of Lading.

10. **Cancelling clause** See Clause 30
Should the vessel not be ready to load (weather in berth or not) on
or before the date indicated in Box 19, Charterers have the option
of cancelling this contract, such option to be declared, if demanded,
latest 48 hours before vessel's expected arrival at port of loading.
Should the vessel be delayed on account of average, whether or otherwise,
Charterers to be informed as soon as possible, and if the vessel is
delayed for more than 2 days after the agreed cancelling date, Charterers to
declare if they cancel or maintain this contract within a new cancelling date as
requested by the Owner.

11. **General Average in London**
General average to be settled according to York-Antwerp Rules,
1974, Proprietors of cargo to pay the cargo's share in the general
expenses even if same have been necessitated through neglect or
default of the Owners' servants (see clause 2).

**As amended 1990    English law to apply**

12. **Indemnity**
Indemnity for non-performance of this Charterparty, proved damages,
not exceeding estimated amount of freight.

13. **Agency**                                          43
In every case the Owners shall appoint his own or Agent as nominated by
Charterers, both at the port of loading and the ports of discharge.

14. **Brokerage**
A brokerage commission at the rate stated in Box 20 on the freight
earned is due to the party mentioned in Box 20.
~~In case of non-execution at least 1/3 of the brokerage on the estimated
amount of freight and dead freight to be paid by the Owners to the
Brokers as indemnity for the latter's expenses and work. In case of
more voyages the amount of indemnity to be mutually agreed.~~

15. **GENERAL STRIKE CLAUSE**
Neither Charterers nor Owners shall be responsible for the consequences of any strikes or lock-outs preventing or delaying the
fulfilment of any obligations under this contract.
If there is a strike or lock-out affecting the loading of the cargo,
or any part of it, when vessel is ready to proceed from her last port
or at any time during the voyage to the port or ports of loading or
after her arrival there, Captain or Owners may ask Charterers to
declare, that they agree to reckon the laydays as if there were no
strike or lock-out. Unless Charterers have given such declaration in
writing (by telegram, if necessary) within 24 hours, Owners shall
have the option of cancelling this contract. If part cargo has already
been loaded, Owners must proceed with same, (freight payable on
loaded quantity only) having liberty to complete with other cargo
on the way for their own account.
If there is a strike or lock-out affecting the discharge of the cargo
on or after vessel's arrival at or off port of discharge and same has
not been settled within 48 hours, Receivers shall have the option of
keeping vessel waiting until such strike or lock-out is at an end
against paying half demurrage after expiration of the time provided
for discharging, or of ordering the vessel to a safe port where she
can safely discharge without risk of being detained by strike or lock-out. Such orders to be given within 48 hours after Captain or Owners
have given notice to Charterers of the strike or lock-out affecting
the discharging. On delivery of the cargo at such port, all conditions
of this Charterparty and of Bill of Lading shall apply and vessel
shall receive the same freight as if she had discharged at the
original port of destination, except that if the distance of the substituted port exceeds 100 nautical miles, the freight on the cargo
delivered at the substituted port to be increased in proportion.

16. **War Risks ("Voywar 1950")**
(1) In these clauses "War Risks" shall include any blockade or any
action which is announced as a blockade by any Government or by any
belligerent or by any organised body, sabotage, piracy, and any actual
or threatened war, hostilities, warlike operations, civil war, civil commotion, or revolution.
(2) If at any time before the Vessel commences loading, it appears that
performance of the contract will subject the Vessel or her Master and
crew or her cargo to war risks at any stage of adventure, the Owners
shall be entitled by letter or telegram despatched to the Charterers, to
cancel this Charter.
(3) The Master shall not be required to load cargo or to continue
loading or to proceed on or to sign Bill(s) of Lading for any adventure
on which or any port at which it appears that the Vessel, her master
and crew or her cargo will be subjected to war risks. In the event of
the exercise by the Master of his right under this Clause after part or
full cargo has been loaded, the Master shall be liberty either to
discharge such cargo at the loading port or to proceed therewith.
In the latter case the Vessel shall have liberty to carry other cargo
for Owners' benefit and accordingly to proceed to and load or
discharge such other cargo at any other port or ports whatsoever,
backwards or forwards, although in a contrary direction to or out of or
beyond the ordinary route. In the event of the Master electing to
proceed with part cargo under this Clause freight shall in any case
be payable on the quantity delivered.
(4) If at the time the Master elects to proceed with part or full cargo
under Clause 3, or after the Vessel has left the loading port, or the

**2.**

# PART II
## "Gencon" Charter (As Revised 1922 and 1976)

Including " F.I.O. „, Alternative, etc.

last of the loading ports, if more than one, it appears that further performance of the contract will subject the Vessel, her Master and crew or her cargo, to war risks, the cargo shall be discharged, or if the discharge has been commenced shall be completed, at any safe port in vicinity of the port of discharge as may be ordered by the Charterers. If no such orders shall be received from the Charterers within 48 hours after the Owners have despatched a request by telegram to the Charterers for the nomination of a substitute discharging port, the Owners shall be at liberty to discharge the cargo at any safe port which they may, in their discretion, decide on and such discharge shall be deemed to be due fulfilment of the contract of affreightment. In the event of cargo being discharged at any such other port, the Owners shall be entitled to freight as if the discharge had been effected at the port or ports named in the Bill(s) of Lading or to which the Vessel may have been ordered pursuant thereto.
(5) (a) The Vessel shall have liberty to comply with any directions or recommendations as to loading, departure, arrival, routes, ports of call, stoppages, destination, zones, waters, discharge, delivery or in any other wise whatsoever (including any direction of recommendation not to go to the port of destination or to delay proceeding thereto or to proceed to some other port) given by any Government or by any belligerent or by any organised body engaged in civil war, hostilities or warlike operations or by any person or body acting or purporting to act as or with the authority of any Government or belligerent or of any such organised body or by any committee or person having under the terms of the war risks insurance on the Vessel, the right to give any such directions or recommendations. If, by reason of or in compliance with any such direction or recommendation, anything is done or is not done, such shall not be deemed a deviation.
(b) If, by reason of or in compliance with any such directions or recommendations, the Vessel does not proceed to the port or ports named in the Bill(s) of Lading or to which she may have been ordered pursuant thereto, the Vessel may proceed to any port as directed or recommended or to any safe port which the Owners in their discretion may decide on and there discharge the cargo. Such discharge shall be deemed to be fulfilment of the contract of affreightment and the Owners shall be entitled to freight as if discharge had been effected at the port or ports named in the Bill(s) of Lading or to which the Vessel may have been ordered pursuant thereto.
(6) All extra expenses (including insurance costs) involved in discharging cargo at the loading port or in reaching or discharging the cargo at any port as provided in Clauses 4 and 5 (b) hereof shall be paid by the Charterers and/or cargo owners, and the Owners shall have a lien on the cargo for all moneys due under these Clauses.

17. **GENERAL ICE CLAUSE**     *See Clause 18 -vessel*

**Port of loading**
(a) In the event of the loading port being unacceptable by reason of ice when vessel is ready to proceed from her last port or at any time during the voyage or on vessel's arrival, or in case frost sets in after vessel's arrival, the Captain for fear of being frozen in is at liberty to leave without cargo, and this Charter shall be null and void.
(b) If during loading the Captain, for fear of vessel being frozen in, deems it advisable to leave, he has liberty to do so with what cargo he has on board and to proceed to any other port or ports with option of completing cargo for Owners' benefit for any port or ports including port of discharge. Any part cargo thus loaded under this Charter to be forwarded to destination at vessel's expense but against payment of freight, provided that no extra expenses be thereby caused to the Receivers, freight being paid on quantity delivered ( in proportion if lumpsum ), all other conditions as per Charter.
(c) In case of more than one discharging port, and if one or more of the ports are closed by ice, the Captain or Owners to be at liberty either to load the part cargo at the open port and fillup elsewhere for their own account as under section (b) or to declare the Charter null and avoid unless Charterers agree to load full cargo at the open port.
(d) This Ice Clause not apply in the Spring

**Port of discharge**
(a) Should ice (except in the Spring) prevent vessel from reaching port of discharge Receivers shall have the option of keeping vessel waiting until the re-opening of navigation and paying demurrage, or of ordering the vessel to a safe and immediately accessible port where she can safely discharge without risk of detention by ice. Such orders to be given within 48 hours after Captain or Owners have given notice to Charterers of the impossibility of reaching port of destination.
(b) If during discharging the Captain for fear of vessel being frozen in deems it advisable to leave, he has liberty to do so with what cargo he has on board and to proceed to the nearest accessible port where she can safely discharge.
(c) On delivery of the cargo at such port, all conditions of the Bill of Lading shall apply and vessel shall receive the same freight as if she had discharged at the original port of destination, except that if the distance of the substituted port exceeds 100 nautical miles, the freight on the cargo delivered at the substituted port to be increased in proportion.

3.

RIDER ATTACHED TO THE
GENCON 1976 CHARTER-PARTY DATE 23rd June, 2005.

**ADDITIONAL CLAUSES:**

22. M/V 'ST. CRISPIAN'
    SID - BLT 1984 - PANAMA FLAG
    DWAT 4,901 MT ON ABT 5.548M SSW
    LOA 95.40M - BEAM 17.80M
    2/2 HO/HA - HADIMS:(1)14.7 X 9.0M - (2)33.6 X 9.0M
    STEEL PONTOON HACOVERS
    GRAIN ABT 6,056.79 M3 / BALE ABT 5,755.45 M3
    CUBICS BREAKDOWN: GRAIN / BALE
    HOLD NO.1: ABT 2,037.10 M3 / ABT 1,926.57 M3
    HOLD NO.2: ABT 4,019.69 M3 / ABT 3,828.88 M3
    DERRICKS 3 X 15 TS
    GRT/NRT: 2,832/1,706
    VSL IS NOT GRAIN FITTED, NOT CO2 FITTED IN HOLDS
    ALL DETAILS ARE 'ABOUT+WOG'

23.    100 % freight payment, less address commission, plus undisputed demurrage
       (if any) at loadingport to be paid within 2 Banking days after completion of loading,
       and Charterers have received fax copy of the non negotiable signed Original B/L's signed and
       marked "Freight prepaid".


       Freight payable to:
       HSBC BANK PLC
       93, Akti Miaouli street,
       Piraeus 185 38
       Greece
       Swift:  MIDLGRAA
       IBAN: GR2407100010000001055698036
       Account number: USD-001-55698-036
       In favour of: Medlink Management S.A.


24.    Notification of the vessel's readiness (NOR) at Loading/discharge port shall be delivered to
       the office of the Charterers or loading/discharging port authority during normal office hours
       between 0700-1700 hours Monday – Friday and between 0700 – 1400 hrs on Saturday,
       Sundays and Holidays included, whether vessel has been Customs declared or not
       (WICCON), whether vessel has been granted free pratique or not (WIFPON), whether vessel
       in port or not (WIPON), whether vessel in berth or not (WIBON). At Charterers option,
       NOR may be tendered in writing by cable, telex, fax or e-mail.
       Time to count as per Charterers Gencon C/P.


25.    Cargo to be loaded/ discharged by stevedores appointed and paid  for by the Charterer's free
       of risk to the Owner's

26.    Demurrage rate USD 5,000 Per day / pro-rata at both ends, despatch rate USD 2,500 Per day
       / pro rata for working time saved at both ends, non reversible.
       Demurrage to be settled latest within 15 days after completion of discharge and upon
       Charterers receipt of Owner's laytime calculation.

27.    Vessel's holds to be clean dry and free from smell and suitable for transport of
       Charterers cargo.

RIDER ATTACHED TO THE
GENCON 1976 CHARTER-PARTY DATED 23rd June, 2005

28.   All port disbursements at load and discharge ports including agency fees to be for
      Charterers' account. Vessel/Owners to be free of port expenses at all ports of call.

29.   The vessel to furnish a certified calibration scale and other data in order to enable
      Charterer's draft survey – or to ascertain quantity loaded / discharged respectively.
      Cargo quantity bends as per draft survey. Vessel to arrive in proper trim to preform draft
      survey. No ballast to be discharged without consent and notification to Stevedore/Agent.
      The cargo to be loaded/stowed/trimmed/carried/discharged in accordance with
      IMO regulations free of expense to the vessel.

30.   Owners to give 5/4/3/2/1 clear notice days to the load port agents and the
      Charterers's.

      Owner's to keep Charterers's and discharge port agents well
      advised of ETA discharge port and 5/4/3/2/1 days notices of ETA.

31.   At loading and discharging port Stevedore damages, if any , to be settled directly between the
      Master and the respective stevedore. Charterers not to be held liable unless stevedores fail to
      repair damages or settle for them , in which case , the Charterer to remain ultimately
      responsible. In any event , such damage shall be notified as soon as reasonable possible by the
      Master to the Charterer and to the stevedores , failing which , they shall not be held
      responsible. The Master shall endeavour to obtain the stevedores written acknowledgement
      of liability.
      If that proves impossible, Master to arrange for inspection of damage and Charterers to
      provide fully detailed invoices and documentation and a confirmation from ship's agency
      that repairs could not be affected at the place of damage or that the stevedores refused to
      settle prior to settlement of claim by vessel. Any claim of alleged damage has to be presented
      by the Master in writing 24 hours after occurrence, not later than the day of completion of
      loading/discharging and anyhow prior to vessel's departure otherwise Charterers cannot be
      held liable and Master / Owners claim thereby is herein waived.

32.   Overtime to be for the account of the party ordering same, however Officers; and crew's
      overtime shall always be for Owners account. Any overtime ordered by port authorities to be
      for Charterers's account.

33.   Forklift trucks / bulldozers  shall be allowed to be used inside hatched/holds if necessary, at
      Charterers's option, but weights including cargo of such forklift/bulldozer shall not exceed
      permissible strength of vessel's tanktop and always subject to Master' discretion. Lifting of
      forklift and bulldozer in and out of holds  to be at Charterers's risk, time and expense.

34.   Cargo quantity bends as per draft survey.
      Vessel to arrive in proper trim to preform draft  survey.

35.   Owners will authorise the Agents to issue and sign the B/L's in case the Master will not be
      able  to do it. Authorisation letter as per Owners standard form. "Freight Prepaid" B/L's to
      be kept  in the Agency custody, and to be released only when Owners have received the
      freight. B/L's to be in strict confirmity with the Mate's receipts.

36.   Charterer's agents at loading and discharging port(s).

**RIDER ATTACHED TO THE**
**GENCON 1976 CHARTER-PARTY DATE 23rd June, 2005**

37.   Any taxes/dues on cargo to be for Charterers' account. Any taxes/dues on vessl/freight to
      be for Owners' account. Indian freight taxes to be for Owners' account

38.   Additional War Rist Insurance and vessel built 1984, overage premium insurance to be for
      Owners' account upto maximum USD2,000.- lumpsum deductible from the freight.

39.   New Jason Clause, New Both to Blame Collision Clause and Paramount Clause
      incorporating the Hague and Hague-Visby Rules are deemed to be fully incorporated in this
      Charter Party.

40.   Any claim under this Charter Party shall be notified in writing and shall be referred
      to arbitration within twelve months of completion of discharge. Arbitration, if any,
      to be settled in London in the usual manner. Each party appointing own arbitrator
      Arbitrator / umpire to be commercial people conversant with shipping.

41.   Any liability to third parties for cargo claim shall be borne and handles by the
      Charterers's except if the damage is due to a proven fault of the Owner's, in which Case
      the Interclub NYPE agreement 1970 and reprints of 1984 shall reply.

42.   No liner, through, transhipment or combined transport Bills of Lading and no waybills
      are to be issued under this Charter Party.

43.   Agents at Load port:
            ASTRAL FREIGHT FORWARDERS (P) LTD.
            MUMBAI
            TEL: +56355469/70/71
            E-MAIL: astralfreight@vsnl.net
            PIC CHERNYSHEV MIKHAIL

      Agent at Discharge ports:

            Dubai/Jebel Ali: Barwill, Dubai
            Dammam: Barwiii, Dammam
            Kuwait: AL-Badar Shipping

44.   Fixture to be kept strictly private and confidential.

45.   In case of congestion at both ends the Master has the right to tender Notice of Readiness
      Even by cable/telex/fax/E-Mail whether in port or not, whether in berth or not, whether
      In free pratique or not, whether in customs clearance or not.

46.   Time at second and subsequent ports to count on arrival, pilot to pilot.

**RIDER ATTACHED TO THE**
**GENCON 1976 CHARTER-PARTY DATE 23rd June, 2005**

47.     For all ports used Charterers guarantee that the vessel is free of port expenses including agency fee. The Charterers will arrange to pay the Disbursements to the agents on Owners' behalf and hereby undertake the responsibility to keep Owners harmless in case of any delay/consequences in connection with non-payment of Disbursements.


**OWNERS:**                                    **CHARTERERS:**


.................................              ...............................

## IN THE MATTER OF THE ARBITRATION ACT 1996

## AND

## IN THE MATTER OF AN ARBITRATION

## BETWEEN

### GUSTO SHIPPING S.A.
of Panama

**Claimants**
**(Owners)**

## AND

### SITARA SHIPPING LIMITED
of Mumbai, India

**Respondents**
**(Charterers)**

### m.v. "GUSTO"

### Charterparty dated 26th September 2005

### FINAL ARBITRATION AWARD

## WHEREAS:

1.    By a Charterparty on an amended "Gencon" form, as evidenced by a Fixture Recapitulation of 26th September 2005 based on a pro forma Charterparty for m.v. "St. Crispian" of 23rd June 2005, the Claimants (hereinafter referred to as the "Owners") chartered their vessel, m.v. "Gusto", to the Respondents (hereinafter referred to as the "Charterers") for the carriage of a cargo of minimum 1,700 / maximum 2,000 metric tonnes of bagged rice from 1 safe port, 1 safe berth Djibouti, to discharge at 1 safe port, 1 safe berth Massawa, on the terms and conditions more particularised therein.



**EXHIBIT**

D

*Page* 2

2.     The Fixture Recapitulation and the Charterparty provided that should disputes arise the same should be referred to arbitration in London and provided, inter-alia, as follows.

### Clause 11

"...*as amended 1990 English Law to apply*"

### Clause 40

"*Any claim under this Charterparty shall be notified in writing and shall be referred to arbitration within twelve months of completion of discharge. Arbitration, if any to be settled in London in the usual manner. Each party appointing own Arbitrator, Arbitrator / Umpire to be commercial people conversant with shipping.*"

3.     Disputes having arisen, more particularised below, the Owners appointed me, the undersigned William Robertson of The Atlas Room, 37 Woodpecker Crescent, Burgess Hill, West Sussex, RH15 9XY, as their appointed Arbitrator.

       However, the Charterers failed to appoint an Arbitrator of their choice, pursuant to the terms of the Arbitration Act 1996, and I subsequently accepted appointment as Sole Arbitrator in the reference.

       I am a full member of the London Maritime Arbitrators Association, a commercial man and a member of the Baltic Exchange in London.

4.     The seat of the arbitration is London.

5.     The disputes referred to the undersigned concerned claims by the Owners in respect of outstanding freight, demurrage, a payment regarding the release of the vessel from Massawa and war risk insurance in a sum of US $36,426.65, (together with a sum of US $2,200.21 being left over from the previous fixture). The Owners also claimed interest and costs.

       The Charterers denied liability.

7. Jun. 2007 14:19                                      No. 0474   P. 11/23

07-JUN-2007 11:08        ROBMARINE SHIPPING LTD        01444 876941    P.05

*Page 3*

6.      I received written submissions from London solicitors representing the Owners and from Indian solicitors representing the Charterers. The parties were content that I proceed to an Award on the basis of the written submissions alone without an oral attended hearing. Neither of the parties requested a Reasoned Award.


**NOW I**, the said William Robertson, having taken upon myself the burden of Sole Arbitrator in relation to the disputes between the parties, and having read the written submissions and documents produced to me, and having weighed and considered the facts and the evidence, **DO HEREBY MAKE, ISSUE AND PUBLISH** this my **FINAL ARBITRATION AWARD** as follows:


**I FIND AND HOLD** that the Owners' claims succeed in full in the sum of US $38,356.86.


**I AWARD AND ADJUDGE** that the Charterers shall forthwith pay to the Owners the sum of US $38,356.86 (Thirty-Eight Thousand, Three Hundred & Fifty-Six United States Dollars and Eighty-Six Cents), together with interest thereon at a commercial rate of 7% per annum from 1st November 2005, compounded at three monthly intervals, until the date of payment by the Charterers.


**I FURTHER AWARD AND ADJUDGE** that the Charterers shall bear and pay their own and the Owners' recoverable costs of the reference (the latter to be determined by me if so requested, for which determination I hereby reserve powers and jurisdiction) and that the Charterers shall bear and pay the cost of this my **FINAL ARBITRATION AWARD**, which **I HEREBY DETERMINE** in the sum of £2,875.00, inclusive of my fees and interlocutory charges.

07-JUN-2007 11:08        ROBMARINE SHIPPING LTD              01444 876941    P.05

*Page 4*

ALWAYS PROVIDED that if the Owners have in the first instance paid any sum in respect of the cost of this Award, they shall be entitled to immediate reimbursement from the Charterers of the sum so paid, together with interest thereon at a rate of 7.5% per annum, compounded at three monthly intervals, with effect from the date of payment of such sum by the Owners until the date of reimbursement by the Charterers.

GIVEN under my hand in London                    12ᵗʰ April 2007

WILLIAM ROBERTSON                    WITNESS

**Russell Gardner - GUSTO - URGENT**

| | |
|---|---|
| **From:** | Russell Gardner |
| **To:** | manoj.khatri@psplawoffice.com |
| **Date:** | 12/06/2007 11:58 |
| **Subject:** | GUSTO - URGENT |

Dear Mr Khatri

I refer to the two awards in the above matter which you will have received by now.

Would you please confirm that the award monies (as set out in our fax of 7th June) are being paid.

Details of our costs in relation to the cp 26/09/05 award to follow.


Kind regards


Russell Gardner
Partner
Hill Dickinson LLP

Direct:    +44 (0) 20 7280 9203
Mobile:   +44 (0) 7831 200865
Home tel: +44 (0) 1306 737117
Home fax: +44 (0) 1306 737135

russell.gardner@hilldickinson.com



# Facsimile



HILL DICKINSON

| | | |
|---|---|---|
| To : | PRASHANT S PRATAP LAW OFFICE | Irongate House Duke's Place London EC3A 7HX |
| Attention Of : | MANOJ KHATRI | Tel: +44 (0)20 7283 9033 |
| Fax : | 00 91 22 6669 5699 | Fax: +44 (0)20 7283 1144 |
| From : | RUSSELL GARDNER | |
| No. of Pages : | 22 | |

CC To :
CC Attention Of :
CC Fax :

Our Reference :   RSG/7030/6
Your Reference :                                                                                        Date : 7 June 2007

Subject :   MV "GUSTO" - c/ps 16.08.05 and 26.09.05

We refer to the above matters and have today paid for and collected the Award and Reasons in the September 2005 charterparty reference. A copy is attached and we assume that you will already have received a copy of the Award and Reasons in the other reference (sent to you by Mr Robertson under cover of his letter dated 12th April 2007).

You will see from the latest Award that, save for the war risk insurance premium, our clients have been wholly successful and you will note the amounts to which they are now entitled. We have calculated interest up to the end of this month under both Awards and the total amount payable is set out in the attached breakdown. Obviously, if payment is made sooner, the interest will be reduced accordingly and we attach the relevant calculations for your information.

Please confirm **by return** that arrangements will now be made to pay the Awards forthwith, failing which we shall proceed to enforcement. We should, furthermore, point out that our clients were awarded the costs of the September 2005 reference and we shall let you have a breakdown of these separately. Payment should please be made to the following account:

Royal Bank of Scotland
London Corporate Business Centre
9th Floor, 280 Bishopsgate
London EC2 4RB

| | |
|---|---|
| Name: | Hill Dickinson LLP US$ Client Account |
| Account No: | HITADICL-USD1 |
| Sort Code: | 15-20-25 |
| IBAN No: | GB86 RBOS 1663 0000 0992 56 |
| B/C: | RBOS GB 2L |

We await hearing form you.

Kind regards

Russell Gardner
Hill Dickinson LLP

**CONFIDENTIALITY NOTICE**

The information contained in this facsimile is confidential and intended for use only of the addressee. Any unauthorised dissemination or copying of this facsimile, and any use or disclosure of information contained in it, is strictly prohibited and may be illegal. Please let us know by telephone if this facsimile has been sent to you in error and return it to us by post, at our cost.

Hill Dickinson LLP is a limited liability partnership registered in England and Wales with registered number OC314079. It is regulated by the Law Society of England and Wales. A list of the partners is open to inspection at the registered office, Pearl Assurance House, 2 Derby Square, Liverpool L2 9XL. Any reference to a partner in relation to Hill Dickinson LLP means a member, consultant or employee of Hill Dickinson LLP.